(No. 27860.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS BARTELL, Plaintiff in Error.

*Opinion filed March 21, 1944—Rehearing denied May 15, 1944.*

CHARLES A. BELLOWS, of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JOSEPH A. POPE, all of Chicago, of counsel,) for the People.

Mr. JUSTICE FULTON delivered the opinion of the court:

The plaintiff in error, who will be designated as the defendant in this opinion, was indicted by the grand jury of Cook county at the April term, 1943, on the charge of murdering his daughter, Linda Constance Bartell. The case was tried before a jury, and the defendant was found guilty of manslaughter. After motions for new trial and in arrest of judgment were overruled, the defendant was sentenced to serve a term of from one to fourteen years in the State penitentiary. This writ of error was sued out to review the proceedings of the trial court.

The evidence shows that Thomas Bartell, with his wife and baby, moved into the basement apartment of a rooming house at 3204 Washington street in Chicago on December 20, 1942. There were thirteen apartments in the building. The baby became deceased on April 22, 1943, under suspicious circumstances, and the defendant was arrested shortly thereafter.

The testimony in behalf of the State, as disclosed by four witnesses, namely, Marie Schulte, the housekeeper in the rooming house, Eugene Higgins, Mary McGuire and Julia Zuliani, shows that on different occasions the witnesses heard the defendant, Thomas Bartell, slapping the deceased child in his basement apartment. These witnesses were all neighbors who went to the defendant's apartment and requested him to stop beating the child, and he replied

that it was nobody's business and that if he wanted to beat that baby he was going to beat it. The police were notified of the defendant's conduct by one of the witnesses and came to the apartment to investigate the complaint. Three of the women neighbors testified that Bartell told them to mind their own business and that if he wanted to hit the child he was going to hit it; that they also heard him say, "If I want to beat my child, the Army and Navy cannot stop me from beating her." One or two of the witnesses testified that they heard the voice of Bartell, at the time of the slapping in the apartment, use the following expression: "Shut up, God damn you, shut up."

Charles Janousek, a police officer, testified that he had gone to the home of the defendant and warned him that the neighbors had complained about his abusing his wife and child; that while there he saw the child and that she had an abrasion on the upper lip and there was a bulge on the left cheek. This was on February 24, 1943.

Charlotte Tipton, the mother-in-law of the defendant, testified that in the month of March, 1943, she saw the baby's face which was scarred at the cheek and that she was present at the State's Attorney's office when her daughter, Mrs. Bartell, said the defendant slapped the baby while she was on the floor.

The State further introduced the testimony of the coroner's physician, Jacob Goodman, who held a *post-mortem* examination on April 22, 1943, shortly after the decease of the child. He testified that his examination revealed certain bluish-purple areas on the right forehead; also, on the right side above the right eye and on the side of the temple; that there was a bruise on the lower right jaw, a laceration of one lip and grey-blue discolorations on the left cheek; also, a contusion on the right elbow and other bruises and discolorations on the body of the child. He stated that on examination of the skull there appeared a thin line of fracture of the skull and that the brain showed

minute purple-red hemorrhages on the right side. He gave it as his opinion that the entire brain was injured and that the death of the child was due to concussion of the brain and fracture of the skull due to trauma or injury.

Thelma Bartell, who was called as a witness by the court, was the wife of the defendant and over objection testified to conversations with her husband relative to who was the father of their child. She testified that on the morning when the child died her husband did not strike the child but that the child fell on the floor. When asked if she did not tell the prosecutor previously that her husband struck the child while she was on the floor, she replied: "I refuse to answer that."

The State also offered in evidence a statement of the defendant taken at the police station and made in the presence of his wife, an assistant State's Attorney and the police officers within a few hours after the death of the child and while he was under arrest. From that statement, it is shown that the deceased child was twenty-one months old; that on April 22, 1943, the defendant got up about nine o'clock for breakfast; his wife had previously put the youngster in a chair at the table and that while the child was so seated she wet on the floor. The statement further showed that the defendant told his wife to get him some socks which were in the bedroom and that his wife got the socks for him and threw them and they fell on the floor and one of the socks became wet; that he then became angry and that he slapped the twenty-one-month-old child on the cheek and ordered her to get down off her chair and stand in the corner. It further appears from the statement that he and his wife got into an argument over the socks and that he struck her on the forehead. It further appears that the defendant struck the child about five times, twice in the face and two times on the behind; that he struck the child in the face after the child was in the corner and his wife told him there were no more clean

socks; that the blow was on the cheekbone on the left side and that after he struck the child she fell in the middle of the kitchen floor; that the child got up and fell down again and he picked her up and put her in her crib. It further shows that when he did not hear any sounds coming from the child in the crib, he observed that the child was getting blue; that he took the child out of the crib and tried to give her artificial respiration and that when he put the child on her stomach and tried to get her to breathe, blood came out of her mouth, and when he breathed into her mouth, it came out of her nose. That statement further showed that the defendant said he slapped the child about four or five times a month, but never hit her with a closed fist. He admitted in that statement that neighbors had knocked on his door and asked him to stop striking his child and that he asked them what business was it of theirs if he was beating his own child.

In behalf of the defendant, five witnesses appeared and testified that they had known the defendant for periods ranging from seven to nineteen years and that his reputation in the community for being a peaceful and law-abiding citizen was very good.

The defendant took the stand in his own behalf and testified that he had infantile paralysis when he was three months old and that he had been a cripple the greater part of his lifetime. He testified that he never struck the baby hard, but would occasionally spank her on the behind when she would be naughty; that his wife told him that the baby had fallen on the sidewalk on the day before the baby died; that Mrs. Zuliani, one of the women neighbors who testified against him, was drunk around the house on several occasions and that when she came to his door she was under the influence of liquor. He denied saying that the army and navy could not stop him from beating his child; that on the morning of April 22, 1943, he got up around nine o'clock in the morning and sat down at the

table in the kitchen; that he noticed that the floor was wet around the baby's chair and called her attention to what she had done; that he had been trying to break her of the habit of wetting; that he slapped her on the behind and told her to go to the corner; that after she had been in the corner about five minutes, he called her back and she started to walk toward him, and when she got to the center of the floor she fell and started to cry; that she got up on her hands and knees and fell down again; that he ran over and picked her up and put her in the crib; that he then went into the kitchen where he got into an argument with his wife and slapped her after she had called him some names; that he then noticed the baby's lips were blue and he became frightened and told his wife to go upstairs and call the doctor; that he took the baby out of the crib and put her over a kitchen chair on her stomach and tried to apply artificial respiration; that the fire department came with a pulmotor and worked over her about thirty-five minutes, but were unable to revive her; that he never made any statement to the assistant State's Attorney that he struck the child in the face and that he also told them that the child fell as she was coming from the corner.

There are two main questions raised by the defendant as to why this case should be reversed: first, that the People did not prove the defendant guilty beyond all reasonable doubt of the crime of manslaughter and, second, the trial court erred in permitting the People to call the wife of the defendant as a court's witness and allowing her to testify concerning privileged communications between the defendant and his wife.

It appears to be the contention of the defendant that because there is no direct evidence tending to show that he struck his daughter, Linda Constance Bartell, the evidence in this case does no more than raise a suspicion of guilt and that the judgment of conviction should be reversed. We concede that the rule is well settled in this

State that the guilt of a defendant must be so established as to exclude every other reasonable hypothesis of innocence. (*People* v. *Ahrling*, 279 Ill. 70, and *Purdy* v. *People*, 140 Ill. 46.) However, a review of the evidence in this case shows that four witnesses, all neighbors of the defendant, on different occasions heard the defendant slapping the deceased child in his basement apartment. This is corroborated by the remarks of the defendant made to the witnesses when they complained about his treatment of the child. This testimony as to his conduct is further corroborated by the positive testimony of the coroner's physician who testified to various bruises and injuries to the face, head and body of the deceased child. There is no denying but there was a skull fracture, and although the defendant on the witness stand denied some of the testimony introduced on the part of the State, his admissions, shown on the statement, of striking the child, not once but a great many times, and other features of his evidence all relate a story of brutality and unnatural treatment of the child which justified the jury in believing that Linda Constance Bartell was mortally injured by the defendant. Direct testimony is not required to prove the means causing the death of a deceased person. The means and manner of death may be inferred from the circumstances proved. (*People* v. *Sapp*, 282 Ill. 51.) Where the facts and circumstances proved on the trial carry conviction, this court will not substitute its opinion for that of the jury simply because there is some conflict in the evidence. (*People* v. *Martishuis*, 361 Ill. 178.) We believe there was sufficient competent evidence in the record to support the verdict of guilty in this case.

It may be conceded that the defendant is warranted in complaining about the admissibility of certain evidence on the part of the defendant's wife. She was called as a court witness and testified to certain privileged communications between herself and the defendant during coverture.

A portion of section 6 of division XIII of the Criminal Code reads as follows: "In all criminal cases, husband and wife may testify for or against each other: provided, that neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during coverture, except in cases where either is charged with an offense against the person or property of the other, or in case of wife abandonment, or where the interests of their child or children are directly involved, or as to matters in which either has acted as agent of the other."

Under the authority of this section of the statute, we believe it was not proper for the court to admit conversations between the defendant and his wife concerning the fatherhood of the child, which were obtained by means of the marriage relation. We do not believe the amendment of 1937 quoted above changes this rule as to the competency of witnesses in criminal cases. An objection to the same should have been sustained. However, we think the evidence in this case shows the guilt of the defendant in such a conclusive manner as to prove beyond a reasonable doubt and to a moral certainty that the defendant and no one else committed the crime charged. It is our opinion that the competent evidence in the record leaves no room for any doubt of the defendant's guilt. In *People* v. *Cleminson,* 250 Ill. 135, this court, in meeting a similar situation, held the following: "If this were not so, our duty to reverse this judgment would be most clear. The question then arises, in a case where the competent proof in the record shows the guilt of the accused beyond any doubt but where the record also shows errors of so grave a character as those before referred to,—errors that would require the reversal of a judgment in a case where the evidence left room for doubt of the guilt of the accused,—whether it is the duty of this court to reverse the judgment or to affirm it on the ground that the guilt of the defendant was so

conclusively established by competent proof that the judgment should be affirmed notwithstanding the errors committed. After much deliberation, we have concluded that as we cannot say that upon the competent evidence there might be a doubt as to defendant's guilt, we would not be justified in reversing the judgment on account of the errors committed." This principle has been followed in several later cases in this court. In *People* v. *White,* 338 Ill. 33, where it was held that the court erred in admitting evidence of other robberies, testified to by an accomplice, it was stated: "It is not the purpose of a reviewing court to determine in a criminal case whether the record is perfect, but to determine whether the accused has had a fair trial and whether or not his conviction is based upon competent evidence establishing his guilt beyond a reasonable doubt. (*People* v. *Spaulding,* 309 Ill. 292.) Where it can be said from the record that the errors complained of could not reasonably have affected the result of the trial, the judgment of the trial court should be affirmed." To the same effect is *People* v. *Lund,* 382 Ill. 213.

The defendant's guilt has been positively proved by his own admissions, the testimony of the coroner's physician and the corroborating proof of the other witnesses. The testimony of defendant's wife was not at all necessary to prove his guilt. The alleged prejudicial statements by her over the controversy of the fatherhood of the child were not competent to prove defendant's guilt in the instant case, but the admission of such testimony could not, in our judgment, reasonably have affected the result of the trial. We believe the defendant has had a fair trial and that his conviction is based upon competent testimony establishing his guilt beyond a reasonable doubt.

The judgment of the criminal court of Cook county will, therefore, be affirmed.

*Judgment affirmed.*