The People of the State of Illinois, Plaintiff-Appellee, v. Charles Steve Brown, Defendant-Appellant.

Gen. No. 51,704.

First District, Fourth Division.

May 12, 1967.

William P. Rhetta and Robert C. Power, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Eldridge Hersey, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

Charles Steve Brown was indicted for murder. After a jury trial a verdict was returned finding Brown guilty of involuntary manslaughter.* Defendant's motion to

---

\* Ill Rev Stats 1965, c 38, § 9-3. Involuntary Manslaughter and Reckless Homicide.] (a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are

arrest judgment and motion for a new trial were denied. Defendant then filed a motion for probation, which was also denied. The trial court entered judgment on the verdict and sentenced the defendant to the Illinois Penitentiary for a term of not less than three nor more than ten years.

The defendant contends that the State failed to prove him guilty beyond a reasonable doubt; that the court erred in admitting color slides into evidence before the jury; and that a sentence of three to ten years upon a conviction of involuntary manslaughter was excessive.

Thelma Jean Jackson testified that she had two sons, Steven and Roderick; that Roderick was three years old; that she had lived with Brown, the defendant, for two years without benefit of marriage, and that he was the father of Steven. She testified as follows: On October 21, 1965, at 1:30 or 2:00 p. m., she left the apartment and the defendant stayed with her two sons. When she left Roderick was fine, in good spirits, sitting in a small rocking chair; when she returned about 2:30 or 3:00 p. m., she heard him grunting in his crib, and noticed that he just stared at her. When she asked Brown if he had done anything to the child, he replied that Roderick could be sick, just like anyone else. Miss Jackson went downstairs, called the police and asked them to take her boy to County Hospital. While she was telephoning the defendant walked in and said, "You think you're so damn smart"; he hung up the telephone, twisted her arm and took her upstairs. They started arguing, and she said, "You killed my baby!" At that,

likely to cause death or great bodily harm to some individual, and he performs them recklessly.

. . . . . .

(c) Penalty. (1) A person convicted of involuntary manslaughter shall be imprisoned in the penitentiary from one to 10 years.

the defendant started choking her. Afterwards he said he would take her to the hospital, then he put cleaning fluid in Roderick's nose, and tried to stand the child up to dress him, but the boy was limp and unable to stand. Brown then picked him up and they went to the car and drove to County Hospital, where Roderick was found to be dead.

Miss Jackson also testified that prior to that date Brown had beaten Roderick approximately eight times; that he had whipped him with an iron cord "which he cut off from a lamp because she threw all the belts and things away"; that this whipping left little slashes on his arm, stomach and back, and a swollen ear. She further testified that about a month prior to October 21, when Roderick had vomited food, Brown had beaten him with a belt "on his bottom and privates which caused [her] to take Roderick to County Hospital because his privates were swollen. On other occasions the defendant punched Roderick in the stomach and pinched his neck by twisting the skin which always left bruises." She testified that before she left the apartment on October 21, Brown had slapped Roderick's face, and when she returned Brown told her Roderick fell out of a chair because he was sleepy and wanted to go to bed.

Officer Gerald Slattery testified that he was assigned on October 21, 1965, to investigate the death of Roderick; that he observed the body of the victim at the morgue; that later he went to County Hospital where he learned that the child was brought to the hospital at 4:00 p. m. and pronounced dead at 4:05 p. m.

Dr. James W. Henry, coroner's pathologist, testified that his external examination of Roderick on October 21 disclosed numerous old and new scars, contusions or bruises on the forehead, cheeks, lips, upper chest and abdomen, arms, legs and back. The internal examination disclosed brain hemorrhage, major liver damage, and extensive damage to tissue around the kidney. In

414

the opinion of Dr. Henry, the cause of death was due to the application of a traumatic force or multiple traumatic impacts as evidenced by large bruises of recent origin, not to exceed 24 or 48 hours, that were present over the upper abdomen and below the rib level. He correlated those bruises with the rupture of the liver. The subdural hemorrhage in the head which was of recent origin was not the cause of death, but in time it would have been.

■ The defendant argues in this court that the entire proof of the cause of Roderick's death is based on circumstantial evidence, and his argument is based particularly on the fact that the proof that the defendant was a criminal agent causing the death was not sufficiently established. He admits in his argument that in order to have a conviction of involuntary manslaughter it is only necessary to prove beyond a reasonable doubt that the defendant's acts recklessly caused the death. In support of his contention he cites People v. Wilson, 400 Ill 461, 81 NE2d 211, in which case the Supreme Court reversed the conviction of the defendant and remanded the case for a new trial. However, in that case the defendant's wife was burned in a fire in the barn. The State claimed that the defendant murdered his wife in the house and took her body to the barn where he set the fire. The defendant denied killing his wife. The court held that the cause of death, the manner of the death, and the place where the death occurred were in doubt. The facts were much different from those in the case before us.

In People v. Ahrling, 279 Ill 70, 116 NE 764, the court again reversed and remanded on the ground that there was no showing as to the cause of death or as to whether the defendant had killed her or she had committed suicide. Nor is that case applicable to the facts before the court in the instant case.

■ In People v. Hanson, 359 Ill 266, 194 NE 520 the court made the following statement at p 281:

"There is a difference between proving guilt beyond a reasonable doubt and proving it beyond the possibility of a doubt. When the evidence is circumstantial the guilt must be so thoroughly established as to exclude every reasonable hypothesis of the defendant's innocence; (People v. Ahrling, 279 Ill 70; People v. Bentley, 357 id. 82;) but the People are not required to establish it beyond the possibility of a doubt. (People v. Lucas, 244 Ill 603; People v. Depew, 237 id. 574; Pate v. People, 3 Gilm 644.)"

The case before us falls under that rule.

The defendant did not testify, nor did he put on any witnesses to contradict the testimony of the State's witnesses. In People v. Bartell, 386 Ill 483, 54 NE2d 700, a case where the defendant was indicted for murdering his daughter and was found guilty of manslaughter, the State introduced evidence of three neighbors who had on different occasions heard the defendant slapping the daughter; that they requested him to stop beating the child and he told them if he wanted to beat the child he was going to beat it. The testimony of the coroner's physician in that case was that the examination disclosed bruises on the head and face and bruises and discoloration on the body of the child; the cause of death was a fracture of the skull. The child was 21 months old. The defendant testified in his own behalf and put character witnesses on the stand. He testified that he had never struck the child hard, although he had spanked her from time to time; that on the day in question he had slapped the child gently and she fell down and began to cry, after which he put her in the crib and noticed that her lips were blue; that he told his wife

to call the doctor. The court stated that it was the contention of the defendant that because there was no direct evidence tending to show that he struck the deceased, the evidence only raised suspicion of guilt; and the court held that the well-settled rule is that the guilt of a defendant must be so established as to exclude every other reasonable hypothesis of innocence. The court called attention to the fact that the State's witnesses had heard the defendant slapping the child in his apartment; and that that testimony as to his conduct was further corroborated by the testimony of the coroner's physician who testified to various bruises and injuries on the face and body of the child. The court also stated that there was no denying there was a skull fracture, and said, at page 489:

> "Direct testimony is not required to prove the means causing the death of a deceased person. The means and manner of death may be inferred from the circumstances proved. (People v. Sapp, 282 Ill 51.) Where the facts and circumstances proved on the trial carry conviction, this court will not substitute its opinion for that of the jury simply because there is some conflict in the evidence. (People v. Martishuis, 361 Ill 178.) We believe there was sufficient competent evidence in the record to support the verdict of guilty in this case."

The case before us is very similar to the Bartell case wherein the court permitted and considered evidence of prior abuses on the part of the defendant father of the child. From a survey of the record in the instant case it is apparent that there was sufficient evidence introduced by the State to prove the defendant guilty beyond a reasonable doubt.

The defendant also objects to State's Exhibits 8 through 12 (no exhibits have been made a part of the record in this court), which were photographs developed

417

into color slides taken of the deceased after death, which purported to show bruises and scars on the body.

Police officer James Lewis, who is assigned to the Chicago Crime Laboratory, testified that it is a part of his duties to photograph crime scenes, and counsel for the defendant stated he would stipulate that Lewis was qualified to work at the Crime Laboratory. The Assistant State's Attorney said, "Will you stipulate, also, as to his expertee [sic] to the taking of photographs and pictures?" Counsel for Brown said, "I'll stipulate that he is qualified to do whatever he does at the Crime Laboratory." Officer Lewis testified that on October 21, at the County Morgue, he photographed the body of Roderick Jackson, at which time he noticed numerous bruises about his body. He testified that he recognized Exhibits 8, 9, 10, 11 and 12 for identification (which were slides); that he did not develop the slides; that they were marked by name and number; and that Exhibits 8 through 12, and 1 and 7 "truly and accurately portray the scene to which they purport to portray." (Exhibit 1 was a picture of the small rocking chair used by Roderick.)

██ Miss Jackson had testified that she recognized People's Exhibit 2 for identification (a black and white photograph) as a picture of her son Roderick, and that it actually portrayed him as she saw him at the County Morgue on October 22, 1965. This Exhibit 2 was then admitted in evidence, as were Exhibits 8 through 12. In the trial court and in this court the State argues that the slides were admitted in evidence in order to help the jury better understand the nature of the circumstances surrounding the death and cause of death because the victim was a Negro and black and white pictures were not sufficient. People v. Herbert, 361 Ill 64, 196 NE 821, is controlling here, in which case the court held:

"A photograph shown to be a correct representation of a person during a period of time under investigation is competent where the accuracy of the photograph is proved by the testimony of a person acquainted with the appearance of the individual at the time the photograph was taken. It is not necessary that the correctness of the photograph be proved by the testimony of either an expert witness or by the person who took the picture and developed the film. (Brownlie v. Brownlie, 357 Ill 117; 2 Wigmore on Evidence, sec 790.)"

Under the rule laid down in People v. Bartell, supra, the trial court properly admitted the slides. People v. Hoffman, 32 Ill2d 96, 203 NE2d 873; People v. Kolep, 29 Ill 2d 116, 193 NE2d 753.

Brown cites People v. Jackson, 9 Ill2d 484, 138 NE2d 528, in support of his contention that the exhibits should not be admitted. That case is not applicable since the court placed a great deal of stress on the fact that the photograph of the deceased which was objected to and which the Supreme Court held was improperly admitted, was a photograph taken at the hospital after the autopsy, on which photograph there distinctly appeared a portion of the autopsic incision; this was one of the factors making it inadmissible. In that case the court said that the question as to whether the photograph of a deceased person is properly admissible depends on whether it has probative value such as aiding a jury in the better understanding of the evidence. As in People v. LeMay, 35 Ill2d 208, 220 NE2d 184, we feel that the slides in question in the case before us would establish facts in controversy material to the offense, and that the trial court did not abuse its discretion in admitting the slides into evidence.

As we have stated, we have had no opportunity to examine the slides which were objected to.

419

Brown further argues that a sentence of three to ten years in the penitentiary for an offense lacking malice is excessive. His counsel argues in his brief: "There is nothing in the record in aggravation indicating that the Defendant would likely commit another offense; there is nothing in the record indicating that public interest or rehabilitation of Defendant requires that Defendant receive the penalty provided by law, . . ." It is also pointed out by defendant's counsel that the defendant was confined in the County Jail for six months preceding trial, and that he should be placed on probation.

■ ■ We have no authority to grant probation in this court, and would not grant it to this defendant in any event. As to a reduction in sentence, we are governed by the interpretation of the Supreme Court as expressed recently in People v. Hicks, 35 Ill2d 390, 397, 220 NE2d 461:

> "Defendant finally requests reduction by us of sentence imposed by the trial court. It has been observed frequently that where the punishment imposed is within the limits prescribed by the legislature, this court should not disturb it unless it is clear that the sentence constitutes a great departure from the spirit and purpose of the law or it is manifestly violative of the constitutional mandate requiring that all penalties must be proportioned to the nature of the offense. Here, a particularly heinous crime has been committed and we are unable to say that the principles just mentioned have been violated by the imposition of a life sentence. People v. Taylor, 33 Ill2d 417, 424; People v. Smith, 14 Ill2d 95, 97, and cases there cited."

■ The sentence imposed in the instant case was three to ten years. The maximum of this sentence was thus the maximum allowed under the statute, but considering the sadistic and brutal nature of the crime, we do

420

not consider it too severe; nor do we believe that the minimum of the sentence was set too high. While the best practice would leave a substantial spread between minimum and maximum, we believe that the minimum in this case could, nevertheless, have been somewhat higher without requiring reduction.

The judgment of the Circuit Court is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.