THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE TOWERS, Defendant-Appellant.

(No. 58256;

First District (5th Division)—January 31, 1974.

*Modified opinion upon denial of rehearing March 22, 1974.*

James J. Doherty, Public Defender, of Chicago (Marilyn Dershem Israel, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and John M. Cutrone, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DRUCKER delivered the modified opinion of the court on denial of petition for rehearing:

Defendant was indicted for the murder of his wife, Joyce Towers. After a bench trial, he was found guilty of voluntary manslaughter (Ill. Rev. Stat. 1969, ch. 38, par. 9—2(a) (1))[1] and was sentenced to three to 12 years.

Defendant contends: (1) that the State failed to prove him guilty of voluntary manslaughter beyond a reasonable doubt in that it was not proven that he was acting under a sudden and intense passion resulting from serious provocation; and that the evidence was insufficient to prove

---

[1] The statute in pertinent part states:

"§ 9—2. *Voluntary Manslaughter.*] (a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

&ast; &ast; &ast;

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

that death occurred as the result of criminal conduct on his part; and (2) that he was denied due process of law because of ineffective assistance of counsel.

At trial Officer Henry W. Boucher testified as a witness for the State that on Saturday, June 13, 1970, at about 9:30 A.M., he went to defendant's apartment in response to a domestic disturbance radio call. Defendant answered the door, told him everything was all right now, and that he and his wife had made up. Defendant told him there had been an argument. After asking to see defendant's wife, the defendant opened the bathroom door so that he saw a woman in the bathtub. He could see her head, shoulders and part of her breast. There was nothing unusual about these parts of her body. The woman said she was Mrs. Towers. Upon inquiry as to how she was, the woman replied groggily that she was fine. At no time did she ask him to remain or to arrest the defendant. He then left the apartment.

Maurice Koen, a long-time acquaintance of the defendant, testified as a witness for the State: He saw defendant on a Saturday in June, although he could not remember the exact date. Defendant told him that a dope peddler had approached him about doing away with a body, and defendant asked him whether he wanted to make some money. Two or three days later, on Monday or Tuesday, he received a phone call from defendant. Defendant wanted to borrow his car so that he could leave town. Defendant told him during this conversation that he had "offed" a guy. The expression was common in the neighborhood. During cross-examination Koen testified that he thought defendant meant that he got the better of a deal over someone, although the term also meant killing someone.

The caretaker of defendant's apartment building testified as a witness for the State: He saw defendant on Saturday morning, June 13, as he was sweeping the steps. He again saw defendant on June 15, at about 12:00 or 1:00 in the afternoon. At this time defendant was going toward the apartment building and defendant mentioned to him that he was going upstairs to see if his dog was at home. About ten minutes later defendant left the building. He did not see which apartment the defendant entered.

Mrs. Billie Gibson, the deceased's sister, testified as a witness for the State that on June 15, 1970, around 9:00 or 9:30 P.M., she tried to see the decedent, but no one answered the door to the apartment. She then called the police who gained entrance into the apartment. Officer Young, the policeman who met Mrs. Gibson at the apartment, testified as a witness for the State that when he arrived at the apartment, he heard either the radio or television playing, but there was no response from inside. He gained entrance through an unlocked window and then unlocked

the front door for Mrs. Gibson. Upon entering the kitchen, he saw that the refrigerator was tied with an electrical cord. When he untied the cord and opened the refrigerator, he found the deceased, wrapped in a blanket, inside.

The pathologist, Dr. Kearns, testified that he examined the deceased on June 16, 1970. His examination indicated that she had been dead for several days. The cause of death was a hemorrhage over the skull that resulted from external violence to the head. It was later stipulated between counsel for defendant and the State that Dr. Kearns found that the deceased had marks and bruises over her head and neck area indicating that there was extreme violence administered to the head and neck area.

On January 31, 1971, defendant was arrested in California.

Defendant testified in his own behalf: On Saturday, June 13, 1970, at about 9:00 or 9:30 A.M., he and his wife had been arguing over an address that she had left lying around. He admitted that there was a fight between him and his wife. He never struck his wife; it was merely a pulling scrape over the telephone number. When his wife tore it and snatched it, she fell backwards and bumped her head on a chest of drawers, and that is when the fight ended. This all occurred before the police came. There was no fight after the police left. He then took their baby and went to the grocery store. Upon his return home, his wife was in the bathtub. About 15 or 20 minutes later he went to check on his wife. He had spoken to her once or twice during this interim period, but there had been no reply. When he went into the bathroom, she was just sitting there as if asleep, lying on her side. He tried to awaken her and, seeing something wrong, tried to revive her. When these attempts failed, he panicked. He never had any intention of attacking his wife.

On cross-examination defendant admitted speaking with Koen, asking to borrow his car, telling him a dope peddler wanted him to get rid of a body and telling Koen that he had "offed" somebody. Defendant maintained that when he said "offed" someone, he was referring to a deal he made. He never called a doctor for his wife and left her in the bathtub for a couple of days. He eventually hid her body in the refrigerator. There was no blood in the bathtub nor on a bed upon which he had placed his wife's body, nor in the refrigerator. His wife was never unconscious but did complain of dizziness. Some of this testimony was impeached when police officer Huffman was called as a witness for the State in rebuttal: He was in the apartment on June 15 and identified photographs introduced into evidence showing blood on the blanket covering the deceased and in the refrigerator.

During closing argument defendant's counsel admitted that the "* * * evidence establishes that the dispute elevated itself into a fight an alter-

cation, I think as a result of it the deceased met her death." Counsel went on to argue:

"＊ ＊ ＊ It is not an easy thing for a man to have to live with the fact that he is either directly or indirectly responsible for the demise of his own flesh and blood. It is not an easy thing.

I suggest to Your Honor that this was an emotional incident, not one with intent or malice or forethought that went beyond that point where certainly the deceased anticipated that it would go and no doubt beyond the point at which the defendant thought it would go."

OPINION

Defendant argues that the judgment of the trial court must be reversed because the evidence did not prove him guilty of voluntary manslaughter beyond a reasonable doubt.

The State concedes "＊ ＊ ＊ that the evidence was insufficient to establish serious provocation—thus preventing a voluntary manslaughter conviction." We have examined the record and agree that there is insufficient evidence to support a conviction for voluntary manslaughter. Therefore, the judgment must be reversed. *People v. Smith* (First District No. 58541), 16 Ill.App.3d 553.

■■ Although the State admits the judgment for voluntary manslaughter must be reversed, it argues that the evidence proved the defendant guilty of involuntary manslaughter beyond a reasonable doubt and, therefore, requests this court to exercise its broad discretion provided for in Illinois Supreme Court Rule 615(b)(3) and enter an order finding the defendant guilty of involuntary manslaughter. This rule provides in pertinent part:

"(b) Powers of the Reviewing Court. On appeal the reviewing court may:

(3) reduce the degree of the offense of which the appellant was convicted";

The power extended by this rule is an extremely valuable judicial tool, but we interpret this rule to be available only when lesser included offenses are involved. (*Cf. People v. Kelly*, 66 Ill.App.2d 204, 211, 214 N.E.2d 290.) We therefore must first determine whether the offense of involuntary manslaughter (Ill. Rev. Stat. 1969, ch. 38, par. 9—3)[2] is a

---

[2] "§ 9—3. INVOLUNTARY MANSLAUGHTER AND RECKLESS HOMICIDE. (a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

lesser included offense to voluntary manslaughter. Ill. Rev. Stat. 1969, ch. 38, par. 9—2.[3]

■■■ In determining whether one crime is a lesser included offense to another, we are guided by the statutory definition of "Included Offense." Ill. Rev. Stat. 1969, ch. 38, par. 2—9, states this definition as:

> "'Included Offense' means an offense which (a) Is established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged, or
>
> (b) Consists of an attempt to commit the offense charged or an offense included therein."

It is our opinion that involuntary manslaughter is established by proof of less than all of the facts required for voluntary manslaughter. Involuntary manslaughter involves the facts of a killing, without lawful justification, by acts likely to cause death or great bodily harm. Voluntary manslaughter is established by proof of the same facts, plus the additional fact that the offender acts under a sudden and intense passion resulting from serious provocation. Since the offense of involuntary manslaughter satisfies the requirements for an included offense to voluntary manslaughter, as expressed in paragraph 2—9, we will proceed to determine if defendant has been proven guilty beyond a reasonable doubt of this offense.

Defendant initially contends that the evidence was insufficient to prove that death occurred as a result of criminal conduct on his part. Defendant argues that the wholly circumstantial evidence did not so thoroughly establish his guilt as to exclude his hypothesis that his wife's death occurred as a result of her falling and striking a chest of drawers with her head. He also maintains that if his testimony is disregarded, there is little left but conjecture as to the cause of death. Therefore, he argues that he cannot be found guilty beyond a reasonable doubt of involuntary manslaughter.

---

[3] "§ 9—2. VOLUNTARY MANSLAUGHTER. (a) A person who kills a individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
(1) The individual killed, or
(2) Another whom the offender endeavors to kill, but he negligently or accidently causes the death of the individual killed.
Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.
(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

"* * * [I]t is the function of the trier of the facts to determine the credibility of the witnesses and its findings will be disturbed only where the evidence is so unsatisfactory as to leave a reasonable doubt as to the defendant's guilt." (*People v. Hampton*, 44 Ill.2d 41, 45, 253 N.E.2d 385.) The trial court found against defendant on this issue, and upon our review of the record we cannot say that the evidence is so unsatisfactory as to require a different conclusion.

The medical testimony demonstrated that extreme violence to the head caused a hemorrhage over the skull resulting in death. It was stipulated that the deceased had marks and bruises over her head and neck area. The defendant urges that the deceased died as a result of her head bumping a chest of drawers when they were fighting over a telephone number. He points to the fact that Officer Boucher stated that the deceased spoke to him "groggily."

■■ Since defendant is the only person who can testify to exactly what happened, the court was not compelled to accept his account as conclusive but could properly consider the surrounding circumstances and the probability or improbability of defendant's story. (*People v. Higgins,* 12 Ill.2d 418, 147 N.E.2d 80.) Officer Boucher, at the time he spoke with the deceased, saw no marks nor bruises nor blood on the parts of deceased's body he was able to see. This evidences the fact that the violence causing Mrs. Towers' death occurred after he left, and in a fashion contrary to defendant's version.

■■■ Defendant admitted to Officer Boucher that he and his wife had a fight. The pathologist stated that Mrs. Towers was dead for a period of a few days, when he examined her on June 16, thus placing her death about Saturday, June 13. It may be inferred fom the caretaker's testimony that defendant was in his apartment at least on Saturday and Monday. Defendant admitted never calling for a doctor and hiding his wife's body in the refrigerator. Defendant, during his testimony, averred that there was no blood on the blanket nor in the refrigerator. This was directly contradicted by the photographs introduced into evidence and the testimony of Officer Huffman. Defendant was arrested in California and admitted trying to obtain a car to leave the city on June 15 or 16. Defendant's flight was a circumstance tending to prove his guilt. (*People v. Rappaport*, 362 Ill. 462, 200 N.E. 165.) Finally, Koen testified that defendant told him he "offed" someone, one meaning of which is that he killed someone. The evidence, although circumstantial, adequately supports the determination that through an unlawful act, defendant was responsible for his wife's death.

■■ Defendant argues that the State failed to prove him guilty of involuntary manslaughter beyond a reasonable doubt because it failed to

prove he acted recklessly.[4] Defendant elaborates on this issue by contending that involuntary manslaughter is a homicide without an intent that death ensue. We agree. But there may be infliction of injury without any intent that death results, yet, if the injury is inflicted so recklessly as to cause death, a conviction for involuntary manslaughter can be sustained. There is evidence to support such a conviction in the instant case.

For example, the trial court could have found from the evidence that the defendant struck his wife, causing her subsequent death. The pathologist stated that there was external violence to the head causing a hemorrhage covering the entire skull. There were numerous bruises and marks in the head and neck area. There was evidence of a prior argument between defendant and the deceased. The trial court did not have to believe the defendant, especially since he was partially impeached. Also, defense counsel's statements during closing argument that decedent's death was the result of a fight between the defendant and decedent must be taken into account.

■■■■ In *People v. Johnson*, 100 Ill.App.2d 13, 18, 241 N.E.2d 584, the court stated:

> "Death resulting from a blow with a fist may be involuntary manslaughter. [Citations omitted.] In People v. Crenshaw, 298 Ill. 412, 131 NE 576 (1921) the indictment charged that the defendant committed murder by striking the deceased with his fist. The reviewing court said:
>
> ' " 'The striking of a blow with a fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences * * *. The act of the defendant in striking the deceased was unlawful, but it is clear from the evidence that it was not delivered with the intent of causing death. * * * The defendant is presumed to have intended the reasonable and probable consequences of his act, but death not being a reasonable or probable consequence of a blow with the bare fist, he is not presumed to have intended it to produce that result, and if he did not, the crime would be manslaughter and not murder'.' "

---

[4] Ill. Rev. Stat. 1969, ch. 38, par. 4—6, states:

"§ 4—6. RECKLESSNESS. A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning."

We, therefore, find the evidence was sufficient to find defendant guilty of involuntary manslaughter beyond a reasonable doubt.

Defendant finally contends that his counsel's closing argument amounted to ineffective assistance of counsel and, therefore, a denial of due process of law. He argues that his counsel abdicated his client's position and admitted his guilt.

■■■ Defendant was represented at trial by privately retained counsel. In *People v. Washington,* 41 Ill.2d 16, 22, 241 N.E.2d 425, the court quoted from *United States ex rel. Feeley v. Ragen,* 166 F.2d 976, 980-981 (CA 7), as stating the standard to be used in determining incompetency as:

> " 'If the action of counsel in the presence of the court in the conduct of the trial reduces the trial to a travesty on justice, such conduct might be considered on the proposition that such a trial was a denial of due process. The conduct of counsel in the trial of a case is that of only one of the officers of the court whose duty it is to see that the defendant receives a fair trial. He is only one of the actors in the drama. The best of counsel makes mistakes. His mistakes, although indicative of lack of skill or even incompetency, will not vitiate the trial unless on the whole the representation is of such low caliber as to amount to no representation and to reduce the trial to a farce.' "

To reach a conclusion of inadequate representation, defendant must demonstrate the actual incompetence of counsel as reflected by the manner of carrying out his duties as a trial attorney and it must further appear that substantial prejudice results therefrom, without which the outcome would probably have been different. (*People v. Harper,* 43 Ill. 2d 368, 253 N.E.2d 451.) Matters going to the exercise of judgment and discretion and trial tactics are insufficient to establish the incompetence of counsel. *People v. Newell,* 48 Ill.2d 382, 268 N.E.2d 17.

■■ We have reviewed the entire record and do not find the representation such as would reduce the trial to a farce. Defendant has not referred us to anything but defense counsel's closing argument as supporting the contention he now makes. Throughout the proceedings counsel ably cross-examined the opposing witnesses and presented defendant's theory of accidental death. Ample evidence had been adduced to prove defendant's guilt, and counsel was faced with a situation where defendant's testimony had been impeached, where defendant had admitted having an argument with the deceased and where defendant admittedly hid the deceased's body in his refrigerator and had fled the state. In spite of this evidence, defendant was found not guilty of murder and convicted only of voluntary manslaughter.

With understandable hindsight, defendant now urges that his trial

counsel's argument was prejudicial and deprived him of a fair trial. It seems obvious that after the presentation of the above cited evidence, defendant's attorney decided that it was in his client's best interest to prevent a conviction for murder by urging that defendant was only guilty of voluntary manslaughter. We cannot under all the circumstances characterize counsel's strategy as ineffective representation. *People v. Gill*, 54 Ill.2d 357, 297 N.E.2d 135.

■■ We reverse the conviction for voluntary manslaughter, but under our power as expressed in Supreme Court Rule 615(b) (3) find the defendant was proven guilty of involuntary manslaughter beyond a reasonable doubt. We, therefore, remand this cause to the circuit court with directions to enter a judgment of guilty of involuntary manslaughter and to impose a sentence for that crime appropriate to the facts and circumstances of the case.

Reversed and remanded with directions.

. SULLIVAN, P. J., and LORENZ, J., concur.