THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KENNETH L. YORK, Defendant-Appellant.

Third District   No. 76-445

Opinion filed February 21, 1978.

Robert Agostinelli and Mark W. Burkhalter, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (James E. Hinterlong and Linda M. Vodar, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE BARRY delivered the opinion of the court:

This appeal was instituted by the defendant, Kenneth L. York, from his conviction by a jury of the involuntary manslaughter of four-year-old Brian Medlock. At the trial, the State established that, on August 14, 1972, Brian was taken to St. Francis Hospital, Peoria, and arrived there in a state of unconsciousness. An examination of the boy disclosed multiple bruises over his body, a broken left collarbone and a hematoma on the back of his head. In the medical opinion of the examining physician, Brian had received a blow to the head that caused unconsciousness and respiratory failure.

On August 15, at approximately 3 a.m., the boy died, and an autopsy revealed the cause of death to be an edema of the brain resulting from a skull fracture, of approximately five inches in length, which was caused by the head striking or being struck by a flat, rigid surface. The examining pathologist testified that, in his opinion, Brian could not have remained conscious for more than a few minutes after receiving the blow which caused the skull fracture. Although the skull fracture was less than seven days old at the time of the autopsy, the afternoon of August 15, the pathologist testified that the fracture of the collarbone was then from seven to 21 days old.

In addition to the fractures, the boy's body was badly bruised. On the boy's face there was a bruise in the central area of the chin surrounding a

laceration, bruises underneath the chin and a bruise around the left eye, predominately on the upper eyelid. Bruises were also found in the area of the left ear where the skull was fractured, on the anterior chest, on the dorsal area of the back, on the buttocks and on the extremities, the front part of one lower leg having numerous bruises. During cross-examination, the pathologist testified that the bruises on the chin, on the eyelid, the one on or around the ear and on the buttocks were less than three days old. The other bruises were estimated to be from three to ten days old.

Mary Kathryn Medlock, mother of the deceased, was called as a court's witness and testified that prior to being taken to the hospital on August 14, Brian was playing with the defendant, either wrestling or boxing in a playful manner. The playing continued for approximately five or ten minutes at which time Mrs. Medlock told the defendant to quit because Brian seemed to be experiencing some pain. After being told to stop wrestling, the defendant brought Brian over to the bed in which Mrs. Medlock was lying and began bouncing him on the bed. Shortly thereafter, Brian's eyes rolled back and he became unconscious.

Mrs. Medlock never saw Brian's head strike any hard, flat object nor did she see Brian fall off the bed. Brian's head did, however, strike her hipbone on approximately the second or third bounce. On the other hand, Mrs. Medlock stated that her memory of the occurrence was hazy, and always had been. While she remembered part of what happened that morning, she stated she never knew what really happened.

Mrs. Medlock also testified that Brian had a tricycle accident on the Wednesday prior to his death, but he had gotten up right after it happened, continued playing and was not hurt. She further testified that the defendant had, on occasion, hit Brian in a playful manner and had disciplined the boy. In addition, Mrs. Medlock testified she was afraid of the defendant and that the defendant had threatened her in regard to her testimony.

There was varying testimony as to the state of Brian's health on Friday, August 11, prior to his death. Mrs. Patricia Langloss, Brian's baby-sitter, testified that on that date, while giving Brian a bath, she noticed nothing unusual about Brian's head but observed that he had a number of bruises on his chest and the middle of his back, what appeared to be pin-pricks, old bite marks on his arms and ears, a slight limp affecting his left leg and a swollen and bruised left shoulder. She observed that Brian did not use his left arm much and did not remember seeing any bruises on the boy's buttocks. On the other hand, Miss Nina O'Shea, an employer of the defendant, testified that she had the opportunity to observe Brian on August 11 and noticed that the left side of Brian's head and neck, as well as his left shoulder, was swollen. Mrs. Canna Thomas, Mrs. Medlock's sister, also testified to having observed Brian on August 11, 1972. On that

date; she observed that Brian was limping, that his shoulder appeared injured, that he had bruises on his back and chest and that there were red marks, like little red dots, circling the boy's navel, but she noticed nothing unusual about his head.

In addition to calling Miss O'Shea to testify, the defense attempted to impeach Mrs. Medlock's testimony by presenting testimony concerning her reputation for untruthfulness. Testimony also established that the carpeting on which the defendant and Brian was playing was soft, shag carpeting underlined with a thick rubber pad.

Although the defendant did not testify, Officer Charles Faw of the Peoria Police Department did testify concerning a voluntary statement given by the defendant. In that statement, the defendant indicated that on Thursday, August 10, he asked Mrs. Medlock to come to his home and bring Brian with her. Mrs. Medlock did come to the defendant's home on that day and stayed that evening. On the following day, both Mrs. Medlock and the defendant went to work. Brian was taken to his baby-sitter. About an hour after they arrived at work, the baby-sitter called and asked what was wrong with Brian's shoulder, indicating that it was swollen. The baby-sitter called again that afternoon. The defendant then told Mrs. Medlock to have the baby-sitter bring Brian to defendant's place of business, which she did. At the end of that day, the defendant and Mrs. Medlock took Brian to the defendant's home.

According to the defendant's statement, sometime on Saturday morning, the defendant rubbed Brian's head and felt a water-filled sac or something of that nature under Brian's hair. Upon questioning Mrs. Medlock of its source, she explained it had been caused by a recent tricycle accident.

On Sunday, Brian appeared to be somewhat better in that he played and the swelling in his shoulder had gone down. At about 8 a.m. on Monday morning, Brian awoke, and the defendant began playing with Brian by pushing him backwards on the carpet. The defendant admitted he was not worried about injuring Brian because the carpet was thick and Brian seemed active and had no problem. Thereafter the defendant started bouncing Brian on the bed, and on about the fourth or fifth bounce, Brian's eyes rolled back in his head and he stopped breathing. The defendant started artificial respiration and told Mrs. Medlock to call an ambulance.

Officer Faw also testified that the defendant stated he would, from time to time, get down on one knee and box with Brian so Brian could get along with the other kids in the neighborhood. The defendant also stated he purchased toys for the boy, disciplined him on occasion and that he would play and roughhouse with the boy at other times, including nibbling each other on the ear. The defendant also indicated to Officer

Faw that he and Brian were very close and that Mrs. Medlock and several of her friends had remarked that there was a great change in Brian's personality because of his association with the defendant.

The only issue presented by this appeal is whether the defendant was proven guilty of involuntary manslaughter beyond a reasonable doubt. In the alternative, the defendant argues that either the State failed to prove the defendant committed an act likely to cause death or great bodily harm which resulted in the death of four-year-old Brian Medlock or the State failed to show the defendant's acts were reckless.

The State is required to prove beyond a reasonable doubt each and every element of the offense of involuntary manslaughter. Involuntary manslaughter, in essence, involves four elements: (1) the defendant must have done an act, (2) which caused death to another, (3) and this act, which was such that it was likely to cause death or great bodily harm, (4) was performed recklessly. (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a).) The statutes also define recklessness:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. * * *" Ill. Rev. Stat. 1975, ch. 38, par. 4—6.

In proving these elements, direct testimony is not required to prove either the means causing death or the manner of death. Both may be inferred from circumstantial evidence. (*People v. Bartell* (1944), 386 Ill. 483, 54 N.E.2d 700; *People v. Brown* (1st Dist. 1967), 83 Ill. App. 2d 411, 228 N.E.2d 495.) For a conviction to be based solely on circumstantial evidence, the facts proved must not only be consistent with the defendant's guilt, but also must be inconsistent with any reasonable hypothesis of his innocence. (*People v. Wilson* (1948), 400 Ill. 461, 81 N.E.2d 211.) However, the State need not establish the defendant's guilt beyond a possibility of doubt. *People v. Bartell* (1944), 386 Ill. 483, 54 N.E.2d 700; *People v. Brown* (1st Dist. 1967), 83 Ill. App. 2d 411, 228 N.E.2d 495.

In the case at bar, the facts establish that Brian died as a result of an edema of the brain caused by a skull fracture which occurred while the defendant was playing with the child. The pathologist testified that Brian could not have remained conscious for more than a few minutes after receiving the blow which caused the skull fracture. The defendant was playing with the boy by "pushing him on the carpet" and bouncing him on the bed. Although Mrs. Medlock did not see Brian's head strike a flat, rigid surface while the defendant was bouncing Brian on the bed, certainly it is reasonable to believe Brian struck his head on the floor or

some other object while the defendant was "pushing him on the carpet." By the defendant's own statement, there was little opportunity for anything else to happen because when the child awoke at 8 a.m., the defendant began to play with him. Immediately thereafter, the defendant bounced the child on the bed, and Brian became unconscious during the bouncing. Nor does the fact that the carpet was soft, soften the inference that Brian's skull fracture could have been caused by his head striking the floor while the defendant was pushing him. There is no evidence that the surrounding walls or the floor beneath the carpet was soft or would "give" if a child's head struck it. Nor does it soften the inference that pushing a four-year-old child on such a surface was an act which was likely to cause death or great bodily harm.

■■ Where the accused in a homicide prosecution is the only person who can testify to exactly what happened, the trier of fact is not compelled to accept the accused's account as conclusive but can properly consider the surrounding circumstances and the probability of his story. (*People v. Towers* (1st Dist. 1974), 17 Ill. App. 3d 467, 308 N.E.2d 223.) Here, except for the voluntary statement to Officer Faw, the defendant did not present any explanation of the incident. Therefore, the jury had only the surrounding circumstances to consider. We believe these surrounding circumstances are sufficient to support a finding beyond a reasonable doubt that an act of the defendant caused Brian's death and it was an act which was likely to cause death or great bodily harm.

■■ As to whether the State proved beyond a reasonable doubt that the defendant acted recklessly, the mental state of the defendant must be inferred from the surrounding circumstances. Recklessness is no exception. (See *People v. Towers* (1st Dist. 1974), 17 Ill. App. 3d 467, 308 N.E.2d 223.) And unless the inference of mental state accepted by the jury is inherently impossible or unreasonable, this court will not substitute its judgment for that of the jury in a case in which the facts could lead to either of two inferences. *People v. Parker* (3d Dist. 1976), 35 Ill. App. 3d 870, 343 N.E.2d 52.

Here, the defendant was pushing and bouncing Brian after he knew the boy had a very sore shoulder, and from the medical testimony, it can be inferred that the boy's collarbone was already broken. The facts that the fractured collarbone was healing and the skull fracture was not, according to the pathologist, indicate that these fractures did not occur simultaneously. Therefore, the jury could infer that, at the time the defendant was playing with Brian, Brian's collarbone was already broken. In addition the boy complained of pain while the defendant was playing with him. Even though the defendant, in his voluntary statement to Officer Faw, indicated that Brian seemed active and had no problem on the morning of August 14, 1972, the members of the jury could rely on

their experiences concerning the painful nature of a broken collarbone and disbelieved that portion of the defendant's statement.

At the very least, the defendant knew the boy's shoulder was very sore, and the boy apparently indicated he was experiencing pain. The jury could infer that the defendant acted recklessly by roughhousing with this boy at all.

■■ The defendant admitted to Officer Faw that he was not worried about Brian being injured. A child with a broken collarbone would not use that shoulder or arm to break his fall. Although the defendant may not have suspected that Brian's collarbone was broken, he was aware that his shoulder was very sore. Furthermore, Brian's baby-sitter testified that Brian did not move that arm much. The jury could find that the defendant, by pushing the child, consciously disregarded a substantial and unjustifiable risk that Brian's head would strike the floor or a wall or some other hard, flat surface because Brian was unable or unwilling to break his fall with his injured arm or shoulder.

The inferences by the jury in this case are reasonable and supported by the evidence. Therefore, we will not interfere with the finding of the jury.

Accordingly, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

STENGEL and SCOTT, JJ., concur.