**People of the State of Illinois, Plaintiff-Appellee, v. Eugene Wesley Kinzell, Defendant-Appellant.**

Gen. No. 68–118.

Second District.

February 25, 1969.

350

John T. Beynon, Public Defender, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney of Winnebago County, of Rockford, and Daniel D. Doyle, Assistant State's Attorney, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

The defendant was indicted for murder. After a jury trial a verdict was returned finding him guilty of that offense. Defendant appeals from the judgment of conviction on the verdict and the sentence to a term of 25 to 50 years.

The defendant contends that the State failed to prove the defendant guilty beyond a reasonable doubt; that the trial court committed reversible error in not interrupting the jury's deliberation; and that the court committed reversible error in the giving of a certain instruction.

Georgia Jerry testified for the State that on the date of the offense, August 20th, 1967, she was twenty-one years old and lived with the thirty-seven-year-old defendant in a two-room bungalow in South Beloit, Illinois. She and the defendant were unmarried. Her two children, Michial, age 8 months, the deceased, and La Donna, age 2 years, resided with them. Some time before 10:00 a. m. she went to the market for cigarettes. At the time she left the house, Michial was in an infant seat in the living room sitting on the floor. Mrs. Jerry was out of the house for fifteen minutes and upon her return the child was not crying. When she returned, she

placed Michial on an adult double bed in the bedroom and she and the defendant had coffee in the other room; that roughly about 9:00 a. m. she heard a thump and went in and found Michial lying on the floor on his back beside the bed. Michial's mother picked him up, he was crying; she rubbed the back of his head and found just a small red mark, but saw no soft spots. She brought Michial into the other room to give him his bottle. He was crying and would not take the bottle, so she gave him a few light swats on the seat, which made him cry more.

The defendant took the baby from his mother and said that if he was going to keep crying he would give him something to cry about, and he sat him down on the davenport. The defendant then took some warm water in a glass and threw it in Michial's face. Michial cried a lot harder and the defendant got some more water and threw it on his face. The defendant picked up Michial and gave him a few light swats. Michial's mother put him in a tub of water to calm him, but he screamed louder and she took him out and changed him. The defendant then took Michial and placed him facing the davenport with his arms upon the cushion. Michial kept crying and he fell once to his seat and then on his back and his head. The defendant picked Michial up and stood him against the davenport again. The child continued to cry.

Mrs. Jerry left about 10:00 a. m. to get some gas, with the child remaining in that same position, standing at the davenport and crying. She was gone for about fifteen or twenty minutes and upon her return the child was standing at the davenport yet, crying. The defendant said that the child wouldn't stop crying and he would get him tired enough to be exhausted and Michial would have reason to cry the next time. The defendant sat down next to Michial on the davenport and snapped his nose and tapped him lightly on the back. The child

screamed louder and then fell a second time. Mrs. Jerry put a blanket on the linoleum floor so Michial wouldn't hurt himself. The child slowed down on his crying and she laid him on the davenport where he fell asleep, roughly about 1:00 or 1:30 p. m. When she laid the child down he was worn out and sobbing a little and his arms and legs were jerking some.

At approximately 2:00 p. m., Mrs. Jerry left the house to pick up children's clothing and returned at approximately 6:00 p. m. The defendant was in the house alone with the children when she left. At one time in the morning Mrs. Jerry told LaDonna to go out and play and she didn't listen to her mother. The defendant said "if you give an order, you have to make her mind" and he took LaDonna by the hand and put her outside. La Donna's mother did not see her go outside, but a few minutes later heard her crying on the front step and told her to come in.

When Mrs. Jerry returned to the house the defendant came out and said he couldn't wake up Mike and that we should get him to the hospital. She saw the child lying on the davenport, pale and limp. At that time she did not know whether he was alive or not. The defendant would not allow her to pick Michial up, saying they should get going; he wrapped the baby up in a blanket and carried him to the hospital in the car. On the way to the hospital Michial's mother asked if Mike was O. K. and the defendant said yes he is still alive like he was in a coma.

A roofer testified for the State, that he was working some fifty-five or sixty feet south of the home in which Mrs. Jerry lived; that between 10:00 a. m. and 1:10 p. m. on the day in question, he heard continuous crying from a child and violent arguments between a man and a woman. He observed, at one point during the loud argument, that the screen door flew open and a man threw the two-year-old girl off the step into the backyard.

353

The Coroner saw the child at the hospital about 6:20 p. m. or shortly thereafter and estimated, based upon evidence of rigor mortis, that death had occurred roughly three hours before. He testified that he observed a soft, spongy area on the right side of the child's head in the rear which was obvious to the eye and definitely palpable to touch.

The admitting nurse at the hospital also testified to having immediately observed the soft, spongy area on the right side of the head which was visible as a swelling and soft and spongy by touch.

The pathologist testified to the softening on one side of the child's head which he characterized as "quite noticeable," and to a small bruise on the right side of the neck, when he first saw the child. On examination he found a large, depressed skull fracture on the right side of the head, and testified that the softness was the product of the fracture. He testified that the softness would have been there from the beginning, immediately after the skull was fractured; that on the left side of the head, opposite the skull fracture, there was another large area of hemorrhaging, indicating a separate blow from an object with a contoured surface; that there were two smaller areas of hemorrhage, one on the forehead and one near the back of the head.

The pathologist further gave the opinion that it was unlikely that falls from a standing position could have caused either of the two major head injuries; but that a fall from the bed, as described, could account for one, but not both, of the two major injuries. He testified to the opinion that the cause of Michial's death was the resulting hemorrhage beneath the covering of the brain from the fracture. The pathologist further testified that the throwing of the glass of water in the face, the snapping of the nose, or a pat on the cheek would not have been sufficient to cause any of the injuries described.

The defendant did not testify or offer any evidence. The jury deliberated from approximately 3:45 p. m. on January 16th, 1968, until 1:00 a. m. on January 17th, 1968, when it returned the verdict.

The indictment charged the defendant in the language of the statute, with hitting and striking Michial, knowing that such acts created a strong probability of death or great bodily harm. (Ill Rev Stats 1967, c 38, § 9–1.) From the evidence defendant argues that the State has failed to prove that the defendant committed an act which caused the death of Michial Jerry, and that the State thus has not proved the corpus delicti. The State argues, and we believe correctly, that the evidence justified a finding beyond a reasonable doubt that the cause of death was a blow or blows to the head of the victim while in the exclusive control of the defendant; that there was evidence of a series of deliberate acts of physical mistreatment clearly demonstrating the defendant's animosity and statutory intent.

 In the trial for murder the corpus delicti consists of two elements—the fact of death, and the fact that death was produced by the criminal agency of some person, but does not in itself include the person who committed the crime, although that is one of the elements necessary to be proved beyond a reasonable doubt to convict the defendant. People v. Manske, 399 Ill 176, 183, 77 NE2d 164 (1948). Direct testimony is not required to prove the means causing the death of the victim. The means and manner of death may be inferred from the circumstances proved, but the guilt of a defendant must be so established as to exclude every other reasonable hypothesis of innocence. This does not mean that the trier of fact is required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt. People v. Bartell, 386 Ill 483, 489, 54 NE2d 700 (1944) ; People v. Huff, 29 Ill2d 315, 320, 194 NE2d 230

(1963); People v. Brown, 83 Ill App2d 411, 415–417, 228 NE2d 495 (1967).

In Huff, defendant was convicted of involuntary manslaughter of a two-year-old child after an indictment for murder, although there was no direct evidence of the actual act which caused the child's death. There was testimony of neighbors that they heard sounds like a belt striking flesh and then a baby crying on numerous occasions preceding the death. Defendant admitted that he had beaten the child with a belt several times but had never struck her head. The child had numerous bruises over her body, including her head, and there was medical evidence that she died of brain damage. A physician testified that the brain damage could have been caused by striking the child on the head with a belt, but that a fall also could have caused the injury. He testified that it was impossible to fix the exact time or day when the fatal injury occurred.

Also in Bartell, there was no direct evidence of the actual act which caused the child's death but a conviction of manslaughter after an indictment for murder was sustained, despite testimony of the defendant that he had been merely slapping the baby to break her of the habit of wetting. The court noted that there was no denying that there was a skull fracture or that the circumstances showed a story of brutality and unnatural treatment of the child which justified the jury in reaching its conclusion (page 489).

Recently this Court had occasion to deny a new trial to a defendant convicted of the crime of the murder of a two-year-old child, where newly discovered evidence was alleged. The new evidence concerned a change in the expert's opinion as to the amount of force required to cause the injuries resulting in the death. We held that the evidence would not probably change the result on retrial in view of the circumstances which showed that the child was healthy immediately prior to his con-

finement in the bathroom with the defendant and that shortly thereafter he was found to be suffering from severe brain damage and other injuries. We held that in view of the express hostility of the defendant to this child the circumstantial evidence that death was caused by his criminal act was overwhelming. We believe that such conclusion is similarly evident here. People v. Burrington, 101 Ill App2d 230, 242 NE2d 433 (1968).

■ From this record the jury was justified in finding beyond a reasonable doubt that the cause of death was a blow or blows to the head received by the victim while in the exclusive custody of the defendant. It is clear that neither of the two major head injuries could have been caused by the acts of abuse which the defendant admitted he committed in Mrs. Jerry's presence.

In the opinion of the pathologist it was unlikely that falls from a standing position could have caused either of the two major head injuries, and while the fall from the bed could have caused one of the injuries it could not have caused both. It was clear from the circumstances following the fall from the bed that that fall did not cause the fatal injury. Mrs. Jerry had examined the child's head following that fall and noticed only a small red spot at the back of his head corresponding with one of the two minor areas of hemorrhage, but observed no other injury and no soft spots. If the fatal skull fracture had occurred at that time the testimony showed that her examination would have revealed it, as the soft, spongy area was caused by a loosened skull and would have become apparent immediately upon fracture.

It was further the testimony of the pathologist that it was improbable that the child could have maintained consciousness into the afternoon after sustaining the fatal injury at 9:00 a. m. in the morning, further excluding the bed fall as a cause. The evidence here relates a story of brutality and unnatural treatment of the child

fully justifying the jury in believing that Michial was mortally injured by the defendant.

▮ Defendant further argues that the circumstances are insufficient to prove that the defendant intended to kill the child or cause him great bodily harm. The intent is implied from the character of the act. People v. Davis, 35 Ill2d 55, 61, 219 NE2d 468 (1966). While the defendant suggests that the inference can only be made from the direct testimony as to the acts of the defendant, none of which would have been sufficient to cause the death, we do not find his position supported by the authorities. The manner of death and the means by which it was inflicted—including the implied intent—may be inferred from the circumstances proved. People v. Huff (supra, page 320) ; People v. Bartell (supra, page 489). The defendant cites the case of People v. Mosby, 25 Ill 2d 400, 185 NE2d 152 (1962) for the authority that essential elements of proof to sustain conviction cannot be inferred but must be established. We do not find that the case holds that essential allegations of indictments cannot be proved by circumstantial evidence. Rather it holds that the jury may not supply the essentials by making unreasonable inferences unsupported by the facts in the record.

It was reasonable for the jury to deduct from the nature of the injury, the medical testimony describing it, and the attendant circumstances of defendant's state of mind and previous conduct toward the child, that the injuries resulted from an intentional act and not from accident.

▮ Defendant complains of the giving of People's Instruction No. 12:

> "The intent with which an act is done may be inferred from the act itself and the surrounding circumstances, it being presumed that every person intends the natural and probable consequences of his actions."

We find no error in the giving of this instruction. People v. Coolidge, 26 Ill2d 533, 537, 187 NE2d 694 (1963).

■ ■ The defendant has also complained that the court erred in not interrupting the deliberation of the jury. The jury received the case at 3:45 p. m. on January 16th, 1968 and did not stop deliberation until 1:00 a. m. on January 17th. Defendant would ask us to infer that a verdict arrived at under these circumstances would be the result of fatigue and exhaustion, but we find nothing in the record to support this contention nor to show that defendant was prejudiced. The length of time a jury may be kept together for the purpose of deliberation is a matter peculiarly within the discretion of the trial judge. People v. Daily, 41 Ill2d 102, 242 NE2d 170, 173 (1968); DeGrandis v. Fay, 335 F2d 173 (1964). We find no abuse of discretion here.

We do not find that the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt and therefore will not disturb the finding of guilty below. People v. Crews, 38 Ill2d 331, 335, 231 NE2d 451 (1967).

The judgment of the Circuit Court is affirmed.

Affirmed.

MORAN, P. J. and DAVIS, J., concur.