THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIRIAM D. WATT, Defendant-Appellant.

First District (1st Division)   No. 1—89—0135

Opinion filed January 11, 1993.—Rehearing denied May 7, 1993.

Robert S. Levy & Associates, of Chicago (Robert S. Levy, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and John Guinn, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

After a jury trial, defendant Miriam Watt was convicted of murdering her granddaughter, Jasmine Ferguson, age two (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). Defendant subsequently received a sentence of natural life imprisonment. Defendant appeals her conviction and sentence, urging the following errors: (1) she was denied effective assistance of counsel; (2) she was not proven guilty beyond a reasonable doubt; and (3) the publication to the jury of gruesome photographs of Jasmine denied her a fair trial. We affirm.

Sandra Ferguson, the victim's mother, testified that she had met defendant through Tyrone Watt, defendant's son, with whom Ferguson shares two children. In November 1986, Ferguson was living with her boyfriend Rodney Young, in Young's apartment in Chicago. Young and Ferguson were living with Ferguson's two children, Andrea, age five, and Jasmine. Ferguson was then pregnant with her third child, Marie. The State introduced photographs of Andrea and Jasmine as they appeared in November 1986. Ferguson, and all subsequent witnesses, agreed that the photographs accurately depicted Andrea and Jasmine as of that time.

Defendant told Ferguson that she would take care of Andrea and Jasmine while Ferguson went to the hospital to deliver her baby. Defendant had taken care of the children in the past at her home without incident. Defendant treated Ferguson as if she were her daughter. On January 5, 1987, defendant came to Young's apartment and picked up the children. Ferguson gave birth to Marie that night.

Defendant took the girls to her home in Harvey, Illinois. When Ferguson returned home from the hospital about a week later, Andrea and Jasmine remained in defendant's home. Ferguson testified that she visited her children on a monthly basis between January and May 1987 so that she could deliver public aid money and food coupons to defendant for the children. The public aid checks and coupons came the same time every month, and Ferguson would visit defendant's home soon after their arrival. Ferguson used public transportation to travel, and the trip to defendant's house took approximately three hours.

Ferguson and defendant conversed daily about the children. Defendant never told Ferguson at any time that the children had any health problems.

In January, Ferguson visited her daughters and they looked fine. In February, Ferguson again visited her daughters and brought her

public aid check and food coupons. Ferguson bought groceries for the children. The children were in good shape during this visit.

On February 29, 1987, Ferguson took Andrea and Jasmine to the Lawndale Christian Center for a scheduled physical exam by Dr. Robert Cutillo. Ferguson routinely took her children there in the past. Both children were found to be in fine shape.

In early March, Ferguson visited her children at defendant's home to buy them groceries with her food coupons. She changed Jasmine's diaper and did not notice any burns or rash on Jasmine's buttocks. Defendant and Ferguson agreed at this time that the children would remain with defendant until Ferguson could find a better place to live.

Ferguson testified that she visited her children for a final time on April 11, 1987. Ferguson, Jasmine, Andrea, and one of defendant's children walked to the store together. Ferguson spent the entire day at defendant's home. The girls looked fine that day.

Sometime after Ferguson's final visit, defendant telephoned Ferguson telling her that someone had reported Ferguson to the Department of Children and Family Services (DCFS) and that a lady was coming to defendant's house to see the children. Ferguson was very upset. A few days later, defendant informed Ferguson that the lady had come to her house and wanted to meet with Ferguson regarding the children. Defendant assured Ferguson that she had not given the lady Ferguson's address. Ferguson never met with anybody. Ferguson later attempted to have her public aid checks sent directly to defendant to prevent DCFS from taking her children away.

On May 3, 1987, defendant telephoned Ferguson in the afternoon hours from the hospital. Defendant said, "I cannot cover for you anymore." Ferguson did not understand defendant. Defendant told her that Jasmine was in the hospital and might die. Ferguson became hysterical.

Ferguson and Rodney Young went to Wyler Children's Hospital. When Ferguson saw Jasmine, Jasmine was hooked up to a machine, had a swollen forehead, and looked skinny. A doctor showed Ferguson Jasmine's back, and she became upset. Ferguson showed the doctor a picture of Jasmine, telling him that this is the way Jasmine looked when she was given to defendant. Ferguson denied inflicting that injury on Jasmine or mistreating any of her children at any time.

At the hospital, Ferguson met with various doctors and defendant to discuss Jasmine. Defendant told Ferguson that if Ferguson had given her a medical card, none of this would have happened to Jas-

mine. The two started arguing with each other, and the meeting was ended shortly thereafter.

On May 5, 1987, Ferguson returned to the hospital and learned that the doctors could do nothing more for Jasmine. Jasmine died when she was taken off the breathing machine later that same day.

Dr. Robert Cutillo, a family practitioner at Lawndale Christian Health Center, testified that Ferguson regularly brought her children to the clinic for routine physical examinations. He testified that while the children had various minor problems from time to time, such as colds, diarrhea and diaper rash, previous examinations, including Jasmine's November 1986 and February 26, 1987, visits, revealed no signs of physical abuse. Cutillo opined that Jasmine's visits to the clinic revealed her to be a healthy, unabused child.

Harvey fire department paramedics William Stockwell and Joseph Weglarz testified that they arrived at defendant's home on May 3, 1987, at approximately 1:45 p.m. Upon their arrival, they were met at the door by defendant, who was carrying Jasmine draped over her arms. Jasmine was limp; her arms were dangling at her sides and her eyes were three-quarters closed.

Defendant told the paramedics that Jasmine had stopped breathing a few minutes earlier. Paramedic Weglarz immediately took the infant in order to ascertain her physical condition while paramedic Stockwell attempted to obtain a brief history.

Weglarz discovered that the victim was not breathing and had no pulse. The infant was cold; her body temperature indicated that she had not been breathing for longer than a few minutes. Weglarz noted that Jasmine was in generally poor physical condition. Her upper lip was split and there were sores outside her mouth; she also had a bump on her head. Jasmine appeared small and undernourished. After an unsuccessful attempt to revive Jasmine by CPR, she was rushed to Ingalls Memorial Hospital in Harvey, Illinois.

Stockwell testified that defendant told him at her home that Jasmine suffered from fainting spells and that she had put the child down in bed after a fainting spell. When defendant tried to arouse Jasmine a few minutes later, she was not breathing. At the hospital, defendant told Stockwell that Jasmine's back, buttocks and thighs were in that condition when Ferguson gave Jasmine to her, and that Ferguson told her it was only a diaper rash which needed only ointment. Defendant further stated that she has been trying to get custody of the children because Ferguson had been beating the children.

Dr. James Adams, an emergency room physician at Ingalls Hospital, testified that when Jasmine arrived, she looked as if she were

dead; she was cold and there was no movement or breathing. Adams was able to revive Jasmine's heartbeat after several minutes. He summoned a transport helicopter to take Jasmine to Wyler Children's Hospital because Ingalls did not have the necessary facilities to care for Jasmine.

Adams testified regarding the injuries he observed on Jasmine. He noticed a bruise on the left parietal area (side) of Jasmine's head. Adams was not able to date the injury which caused the bruise. He testified that, in the emergency room context, injuries are "new" if they occurred right before their arrival to the emergency room and are "old" if they occurred sometime before. Adams considered this an old bruise within this context; Adams saw no signs of fresh or new trauma to Jasmine.

The other major injury Adams observed was a large burn on Jasmine's buttocks, lower back and thighs. A sharp line of demarcation and depigmentation existed around the burn. In Adam's opinion, the injury was an immersion burn caused by someone lowering Jasmine into hot water. He stated that this injury was definitely not diaper rash. Adams could not provide a date the injury occurred; dating burn injuries was beyond his expertise.

Officer Roy Wells of the Harvey police department spoke with defendant at her home after the paramedics left and at Ingalls Hospital. At her home, defendant stated that Jasmine started coughing and would not stop. She picked Jasmine up, who lost consciousness. Defendant attempted mouth to mouth resuscitation, but it did not help. Wells transported defendant and her husband to the hospital.

At the hospital, defendant told Wells that Jasmine had diaper rash when she arrived at her home and that Ferguson had told her to apply Desitin to the rash. Approximately 2½ weeks earlier, defendant was drying off Jasmine after a bath, and her skin began to come off. Defendant told Wells that Andrea had similar burns on her and that Ferguson wanted to teach the baby that irons are hot.

Dr. Aaron Zucker, the director of the pediatric critical care unit at Wyler Children's Hospital, testified about Jasmine's treatment and injuries after her arrival from Ingalls Hospital. Zucker characterized Jasmine upon arrival as comatose. While her heart was beating, she was not breathing on her own and demonstrated no brain activity.

An extensive physical exam of Jasmine revealed her to be undernourished, with bruises on her forehead, a smashed lower lip, burn marks on her legs and back, and some old scars on the soles of her feet. Most noticeable to Zucker was the "full thickness burn" on Jasmine's buttocks and back, involving the three major layers of skin.

Zucker suspected Jasmine had received an immersion burn, which occurs when a child is picked up under the knees and behind the shoulders and dipped into something hot such as water. A burn specialist at Wyler Children's Hospital, whose opinion Zucker relied upon for treatment purposes, concurred in this opinion. Zucker speculated that such a burn required a water temperature of about 160 degrees.

A CAT scan of Jasmine's skull revealed subdural hematomas, which are areas under the skull demonstrating the presence of blood. Zucker observed both chronic or "old" hematomas, which were at least a week old, and a fresh hematoma, which was probably from minutes to a couple days old. The X rays revealed no bone fractures, but Jasmine's bones demonstrated "growth arrest lines," which could reflect malnourishment, infection or simply not being well over a period of months.

Zucker and other medical personnel spoke with defendant for purposes of understanding the origin of Jasmine's injuries and formulating a treatment plan. Zucker testified that Dr. Goldenberg, a Wyler Children's Hospital resident, told him that Goldenberg had spoken with defendant, who said that Jasmine had a history of being neglected by her natural mother and that she had some old burn scars on her arms and legs. Defendant further stated to Goldenberg that Jasmine had a boil on her buttocks which had enlarged causing skin to fall off. Defendant also told Goldenberg that Jasmine acted "clumsy" on occasion, falling down and hitting her head.

Zucker personally spoke with defendant. Defendant related to Zucker what had happened to Jasmine:

"[T]he child was getting a bath, at approximately 1:30 today, and afterward, was told to go upstairs. The paternal grandmother heard a thud, as Jasmine walked out the door, and she was found on her stomach, by the paternal grandmother, and laid on her bed. She was noted to be gasping for air, vomited once, with a streak of blood in it, and then became limp. The paternal grandmother could feel only a pulse, cleaned out her mouth and began mouth to mouth resuscitation. She said she had a stethoscope and could listen and heard a heart-rate that was almost absent, and called the ambulance, who then took the child ***."

Zucker considered part of defendant's story unbelievable. He considered it "highly unlikely" that these head injuries were caused by Jasmine falling, as a fall could not produce such significant head injuries due to Jasmine's short height and small weight. It was Zucker's opinion that the forces which caused these injuries were equivalent to

the forces found in an automobile accident or falls from a first- or second-story window.

Sandra Ferguson and Rodney Young later arrived at the hospital, and Zucker took Ferguson to see Jasmine. Zucker testified that when Ferguson saw Jasmine, she told him that Jasmine did not look anything like the child she had left with defendant. Ferguson showed Zucker photographs of Jasmine taken before Jasmine was in defendant's care. Zucker described Jasmine's appearance in this photograph as "happy and well nourished and kind of round, like a normal toddler." Zucker testified that Ferguson was "aghast" when the blankets were pulled back to show the burn on Jasmine's buttocks.

A second meeting was later held between Zucker, defendant, Ferguson and other hospital personnel. Zucker testified:

"Ms. Watt told us that when Jasmine was given to her to take care of, which was, I believe, in January of that same year, about four and a half months before, she had come to her with what I wrote in my note[s] as having black crinkly skin on her back and buttocks, which would come off when she would be bathed and would be wiped dry.

\* \* \*

Ms. Watt was able to recount in a lot of minute detail and in a very detailed chronological order, different things that had gone on with Jasmine, both from a social history standpoint and the custody and where she lived, her medical, smaller and larger medical problems, in a very logical, intellectualized way.

She denied any knowledge of either she [*sic*] or anyone else that would be in that household, at any time, doing anything intentional to the child or knowing of any accident, major accident, that could account for what we saw. She said that ever since she was caring for the child, she would occasionally—the child, rather, would occasionally fall over, while sitting up like watching TV and would fall over and hit her head.

\* \* \*

We had, as I said, this was a long conversation, probably the better part of an hour, 45 minutes to an hour. After we exchanged this other information, I tried to update all of them on what we saw with Jasmine and where we thought things would go. I told them that between the injuries we saw on the CT scan and the prolonged time that her heart had not been beating \*\*\*, that her chances for any brain recovery were going to be extraordinarily small, if any, and that we would do what we

could to support her, to give us some time to see how nature would take its course.

It was at that time that some different trends in the patterns of conversation between Jasmine's mother and grandmother occurred during that meeting.

\* \* \*

At that point that I was referring to before, where things began to change, Ms. Watt began to cry and said that she blamed herself for not taking Jasmine to the doctor or to the DCFS authorities sooner, when she was falling a lot and such, too, and I put in quotes, 'Get the children taken care of rather than trying to protect Sandra, which is Jasmine's mother,' end quote, from scrutiny.

At that point, Sandra began to address the grandmother and rather than the two of them kind of being on one side of the fence, and the doctors on the other side of the fence, it appeared to me that they were beginning to argue back and forth with each other about who should have done what, to better take care of Jasmine, and who was to blame for what had happened and what her condition was now. It became a back-and-forth accusatory kind of thing that lasted for about ten minutes or so, until finally, we just terminated the meeting, because we weren't getting anyplace."

Zucker expressed his opinion relative to the age of Jasmine's injuries. Zucker opined that Jasmine's burn was "at least a few days old" and her more recent head injury occurred from a few minutes before the CAT scan to probably several days. The older head injuries were a week or two old.

Zucker testified that on May 5, 1987, 36 to 48 hours after the victim was admitted to the hospital, it was determined that Jasmine was brain dead. Artificial respiration was terminated.

Dr. Yuksal Konakci, an assistant medical examiner for the Cook County medical examiner's office, testified that he performed an autopsy on Jasmine's body. Konakci's external examination of Jasmine's head revealed bruises on her head attributable to blunt trauma; Konakci further noted a blunt trauma injury to Jasmine's lips. Jasmine's forehead and nose exhibited healed scars attributable to old trauma. On Jasmine's torso and legs, Konakci observed the large burn, which was partially healing on the margins. Jasmine's torso and legs also indicated scarring, some circular in nature, attributable to old trauma.

Konakci's internal examination of Jasmine's head revealed a subdural hemorrhage on the right side of the head; a small blood clot on the brain's left side; and congestion of the brain's blood vessels and brain swelling. Konakci removed the brain for further examination by a brain pathologist.

Konakci concluded that the primary cause of Jasmine's death was blunt trauma to the head, with a secondary contributing cause being the large burn. Konakci was not asked whether the burn alone could have caused Jamsine's death. Konakci estimated that the burn was at least several days old since there was some healing around the edges of the wound. The blunt trauma injuries to the head were also several days old. Konakci could not date the old scarring injuries on Jasmine's body; they could be up to a year old. Konakci testified that the high number of injuries in this case were consistent with child abuse.

Dr. Carol Haller, an expert in neuropathology, testified regarding her examination of Jasmine's brain. Haller observed a yellow discoloration on the inside of the dura, which is the brain's protective covering. This indicated to Haller that Jasmine suffered a head trauma some time in the past, at least several months old. Haller also observed a subdural blood clot, consistent with trauma, between two to three days old. Jasmine's brain was also swollen, which caused compression of Jasmine's brain stem, resulting in cardiac and respiratory failure. Haller additionally observed another internal brain injury, located where the two sides of the brain connect together, which would have rendered Jasmine comatose at the time such injury occurred.

Haller concluded that the cause of Jasmine's death was brain swelling resulting in respiratory and cardiac failure. The brain swelling was in turn caused by a substantial blow to the head, which also rendered Jasmine comatose. Haller dated the recent brain injury as between two to three days before May 5, 1987, the day of death, but no earlier than May 2. Haller believed that the force required to cause the injuries she observed to be similar to that received from a motor vehicle accident; a simple fall in the home could not cause the injury she observed.

Dr. Anna-Marie Simpson-O'Reggio, an attending physician at LaRabida Hospital and specialist in sexual abuse, endocrinic disease and child abuse, testified about her examination of Ferguson's two other children, Andrea and Marie. From May 4 through May 6, 1987, Simpson-O'Reggio extensively examined Marie. Simpson-O'Reggio concluded that Marie was well nourished, perfectly healthy and showed no signs of abuse. Marie was discharged to her mother, San-

dra Ferguson. On May 15, a follow-up examination was performed resulting in the same conclusion.

On May 8, 1987, Simpson-O'Reggio examined Andrea, then three years, nine months old. Andrea was underweight for her age. Previous weight records of Andrea showed her to be in the 75% weight percentile at 18 months. Her current weight indicated a failure to thrive.

Simpson-O'Reggio noticed signs of child abuse on Andrea. Andrea had linear lesions on her thighs, which were diagnostic of child abuse, rather than an accident. In Simpson-O'Reggio's opinion, these injuries were five to seven days old, having been inflicted between May 1 and May 3. Simpson-O'Reggio also found a linear scar on Andrea's left leg, which was months old, and horizontal scars on her ankles, indicative of being tied down, which were months to years old. These were also signs of child abuse.

On May 15, 1987, Simpson-O'Reggio examined Andrea again and found that she had gained over two pounds in one week, which is a tremendous weight gain for a child that age. There was no evidence of new trauma and Andrea's old injuries were healing.

Simpson-O'Reggio testified about the photographs of Jasmine's buttocks. She opined that the injury was definitely an immersion burn, not diaper rash, since the demarcation of the wound was so definite and there was peeling beyond the superficial layer of skin. Even in the most severe diaper rashes, only superficial layers of skin are involved. She stated that Jasmine could not inflict the wound herself since there would have been "flash marks" where she hit the water. Although Simpson-O'Reggio could not say for sure, she dated Jasmine's burn based on the photograph as under two weeks old.

Detective Robert Farley of the Cook County sheriff's office, a specialist in child abuse cases for over 12 years, testified about conversations he had with defendant during the course of the investigation of Jasmine's death. On May 21, 1987, Farley spoke with defendant at her home after he read defendant her *Miranda* rights. Farley testified that defendant was pretty upset since she felt that Ferguson should be investigated instead of her. She admitted to Farley that Ferguson had not visited her house for a long time prior to Jasmine's death and that Ferguson had not hurt the child. Defendant told Farley that "someone on the edge of the circle" had hurt Jasmine, but she would not explain what the statement meant, and told Farley that he would have to ask her attorney.

Defendant told Farley that the wound on Jasmine's buttocks was diaper rash which she noticed when she was giving the child a bath;

she was scrubbing her back and all the skin was coming off. Defendant told him that she was the only person that washed Jasmine.

On June 2, 1987, Farley spoke to defendant after he placed her under arrest for Jasmine's murder. Defendant told Farley that she heard a thump upstairs and found Jasmine lying on the floor. She told Farley that Jasmine "never walked any good anyway." Defendant put Jasmine into bed next to Miriam, Jr., who called out shortly thereafter that a gurgling noise was coming from Jasmine. Defendant also told Farley that the wound on Jasmine's buttocks was an ammonia burn. She first noticed the burn on March 31 when she saw "elephant skin." Defendant began treating the injury and peeling the skin off with her fingernails. Defendant believed the burn would heal although she also knew something was wrong.

Defendant admitted to Farley that she was the only one bathing Jasmine. Defendant would get the water real hot in the tub and wear rubber gloves so she would not burn her hands. She would then stick Jasmine in the tub and give her what defendant described as "special vaginal baths." Defendant stated that she gave Jasmine these baths to take care of the problem of Jasmine wetting her pants and making the house smell like urine. Defendant knew from her prior nurse training that the baths and burns would not hurt Jasmine because "Jasmine had a high tolerance for pain and it was okay for her." Defendant denied striking Jasmine.

Sylvia Walker, a Department of Children and Family Services (DCFS) case worker assigned to Andrea and Jasmine, testified that DCFS had no records of any child abuse allegations lodged against Ferguson between January 5 and May 3, 1987, and no record of any DCFS personnel visiting defendant's house. Previously, in 1985, an allegation of neglect was made against Sandra Ferguson regarding Jasmine. Another allegation was made in 1986, but it was determined to be unfounded.

Rodney Young, Sandra Ferguson's boyfriend, testified that he currently lives with Ferguson, Marie and Andrea. Young is Andrea's father, but not the father of Marie or Jasmine.

In October 1986, Ferguson, Jasmine and Andrea moved in with Young from Ferguson's mother's house. In January 1987, Andrea and Jasmine went to live with defendant. Jasmine had no burn marks or bruises at that time.

While the children stayed at defendant's house, the children only returned to Young's apartment the one time that Ferguson took them to the clinic; the children stayed about an hour. Young did nothing

harmful to the children during this time. He later dropped them and Ferguson off at the el station.

While the children were at defendant's house, Ferguson would visit them after she received her aid checks. She would travel by bus and spend most of the day there before returning.

On May 3, 1987, Ferguson received a telephone call from defendant regarding Jasmine. Ferguson became hysterical. Young took the receiver, and defendant told him there was no reason for them to come to the hospital.

At Wyler Children's Hospital, Ferguson was crying after seeing Jasmine. Defendant looked nervous to Young, but he never observed her to cry. Defendant told Young that "[Jasmine] could have been retarded [at birth] or something like that."

Later, Ferguson, Young and Marie went to LaRabida Hospital. Ferguson and Marie spent two days at that hospital while tests were run on Marie to detect child abuse. Marie was later allowed to return home with Ferguson and Young. Andrea was also allowed to live in Young's apartment with Ferguson. Young observed bruises and swollen areas on Andrea's feet and hands after she returned. This was the first time that Young had seen any such injuries on Andrea.

Defendant's daughter, Miriam Watt, Jr., testified to being 17 years old and a senior in high school. In January 1987, she lived with her mother and father, Jasmine, Andrea, and her three brothers, Bryan, then age 13, Frederick, then age eight, and Kyle, then age five. Miriam, Jr., was 15 years old at this time. She had another brother, Tyrone, who did not live at home and never visited.

Miriam, Jr., would help her mother baby-sit for Jasmine and Andrea. During their stay at her house, she changed Jasmine's diapers approximately 10 times and helped her mother bathe Jasmine. She sometimes would bathe Jasmine and Andrea together. She never used scalding hot water.

One day, which she could not pinpoint, Miriam, Jr., noticed "silver dollar" sized skin pieces falling off Jasmine's buttocks while Jasmine was standing in the bathtub; defendant was wearing rubber gloves and told Miriam, Jr., it was diaper rash. Jasmine's buttocks appeared puffy, burnt and black. She had never seen skin falling off the victim's buttocks before that day; she became sick to her stomach and cried. Miriam, Jr., never changed or bathed Jasmine after seeing Jasmine in that condition.

Miriam, Jr., testified that she had seen Jasmine suffer two fainting spells while she stayed at their house, the second spell having occurred when the victim was coming from the bathroom and Miriam,

Jr., was in the front room. Jasmine fell over and Miriam, Jr., picked her up. Jasmine smiled at her. Jasmine did not have any bruises on her forehead at this time.

On May 3, 1987, at 1:30 p.m., Miriam, Jr., was in her bedroom sleeping late when she was awakened by gurgling noises coming from Jasmine. Jasmine was in the bed next to her. According to Miriam, Jr., defendant came upstairs and attempted to revive the victim by mouth-to-mouth resuscitation. Defendant then told her to call the paramedics. Only defendant, Miriam, Jr., Andrea, Kyle, and Miriam, Jr.'s, father were home at this time. Miriam, Jr., had not seen Sandra Ferguson visit for about two weeks prior to this day.

During the time Jasmine stayed at the Watt household, Miriam, Jr.'s, father never watched or washed Jasmine. Miriam, Jr., never observed anyone hit or yell at Jasmine or dip her in hot water. While she was growing up, her mother never beat her, and she never saw defendant beat any other family member. Miriam, Jr., characterized her mother's treatment of Jasmine as good, and considered her to be a good mother and grandmother.

Defendant's son, Bryan Watt, age 14, testified that in November 1986, he was 12 to 13 years old. He lived at home with his mother, father, sister Miriam, Jr., and his two brothers Frederick and Kyle. Andrea and Jasmine came to live with them in January. Bryan's older brother Tyrone was not around at this time.

Miriam, Jr., and defendant looked after the children. Bryan never saw skin coming off of Jasmine's buttocks, Jasmine being spanked or having black and blue marks on her forehead. Neither Bryan nor his father watched Jasmine and Andrea. Bryan did not recall the last time he saw Ferguson at his house; it might have been one or two weeks but not two to three days.

Defendant's husband, Frederick Watt, Sr., testified that while Jasmine and Andrea stayed at the Watt household, defendant and Miriam, Jr., would bathe Jasmine. He never looked after Jasmine or bathed her. He never struck Jasmine or dipped her in hot water. He never saw anyone do those things either, and he saw no bruises on Jasmine's face. He never saw Jasmine's buttocks in a burnt condition.

On May 3, 1987, he was at home in his bedroom watching television when he heard a bang. He jumped out of bed, ran to the door, and saw Jasmine lying on the floor. He called defendant from the kitchen, who asked Jasmine what was wrong. Jasmine said nothing. Defendant then took Jasmine upstairs and laid her on the bed. Defendant returned to the kitchen to cook. Ten to fifteen minutes later, Miriam, Jr., called out that Jasmine was "gagging or some-

thing." Defendant ran upstairs to check out Jasmine's condition. Jasmine was later rushed to the hospital after the paramedics arrived. Sandra Ferguson had not been over to the house for about two weeks prior to May 3.

The State rested and defendant's motion for a directed verdict was denied. The court admitted into evidence the State's photographic evidence and permitted its publication to the jury.

Defendant initially presented the stipulated testimony of Sylvia Walker, Jasmine's DCFS case worker. If called to testify, she would state that on May 18, 1987, she had a conversation with Dr. Konakci, who told her that the burn on Jasmine's buttocks was several weeks old and the brain injuries were several days old.

Defendant testified on her own behalf. She was 39 years old at the time of trial and a self-employed owner of a jewelry boutique. She was the mother of Tyrone Watt and the grandmother of Jasmine. Her husband, Frederick Watt, worked at LTV Steel. Defendant was a high school graduate and had completed three years of nursing school in college.

On January 5, 1987, Ferguson called defendant and asked her to look after her children. Ferguson was in labor and Rodney Young was at work. Although she was hesitant to take care of the girls, defendant went to Young's apartment and took Ferguson to the hospital. She then brought Andrea and Jasmine to her home.

Defendant next saw Ferguson when she came to her house in January with the new baby. Ferguson spent the night and left the next morning with all three children to visit her own mother. She did not see Ferguson and the three children for a couple of days. Ferguson was coming and going from her mother's house for about two weeks thereafter.

On February 26, 1987, Ferguson took Jasmine and Andrea to the clinic for a check-up. Ferguson returned the girls to defendant's home late that evening.

In March, Ferguson returned to defendant's house to see her daughters and brought a public aid check. Ferguson spent the night at the house. Defendant and Ferguson talked about the children staying with defendant until Ferguson "got herself together."

Ferguson came to defendant's house on April 3, 1987, and defendant gave Ferguson some money. Ferguson then stayed with the girls at her mother's house until about April 7. Ferguson returned again to the house with a check around April 11 and was coming and going from defendant's house the week of April 11.

On May 1, 1987, Ferguson brought documents from the Illinois Department of Public Aid to defendant which would allow defendant to obtain a medical card for Jasmine and Andrea. Defendant remembered Detective Farley's testimony that, previously, defendant had told him that Ferguson had not been to her house for a long time. Defendant claimed, however, that Ferguson had been to her house on May 1.

Defendant testified that she remembered telling Farley about her conversations with Ferguson relative to Jasmine's buttocks. She told Farley that Ferguson had told her in April that the wound on Jasmine's buttocks was diaper rash and to put Desitin on it. Defendant had called Ferguson about Jasmine's buttocks. They looked black at this time. Ferguson told defendant that Jasmine's buttocks were that way when Ferguson's mother returned Jasmine to her. Defendant called Ferguson on another day and told her about the "bump" on Jasmine's behind and that it was "wrinkled." Ferguson told defendant that it was diaper rash and that she should put Desitin on it.

Regarding her June 2 conversation with Farley, defendant said that Farley asked about Jasmine's buttocks, but defendant would not answer Farley's questions. Defendant told Farley that if other people had told Farley that Jasmine's injury was an ammonia burn then that is what it was.

Defendant denied ever immersing Jasmine in hot water. She admitted wearing gloves when she bathed her but testified that she wore them to prevent her from scratching Jasmine with her gold fingernails. Jasmine normally stood in the tub during baths, but defendant would sit her down in the tub to wash her "private parts." She denied ever hitting Jasmine in the head.

On cross-examination, defendant denied telling Detective Farley that DCFS was going to take Jasmine and Andrea away because Ferguson was sexually and mentally abusing them. She denied telling Farley that children have a high threshold for pain. Defendant also denied telling Harvey police officer Wells that the burns on Jasmine and Andrea resulted from Ferguson teaching them that irons are hot. Defendant only told Wells that a burn on Jasmine's hands was from an iron and that Ferguson was teaching her that things were hot.

Defendant testified that the skin on Jasmine's buttocks gradually came off over a period of time until the last week in April when it all came off. Defendant was concerned and called Ferguson about Jasmine's buttocks. Defendant wanted to take Jasmine to the doctor but Ferguson kept telling defendant that she would take Jasmine to the

doctor. Defendant never took Jasmine to the doctor on her own initiative because Ferguson said she would take care of it.

Regarding Jasmine's bruises on her head, defendant testified that Ferguson told her that Jasmine received one of them when she fell walking from the bus to defendant's house. Ferguson told defendant that Jasmine received another head injury when she fell in a Burger King restaurant. A third head injury was caused by yet another fall.

The day Jasmine was rushed to the hospital, defendant explained that she told Rodney Young that he and Ferguson need not bother coming to Ingalls Hospital because they were taking Jasmine to another hospital. She denied telling Young that Jasmine was retarded at birth; instead, she told him that Jasmine had brain damage from being unconscious for so long.

Defendant rested, and the State presented no rebuttal case. Following deliberations, the jury convicted defendant of murder. A natural life sentence was subsequently imposed. Defendant now appeals.

The first issue we address is whether the State proved defendant guilty beyond a reasonable doubt of murdering Jasmine Ferguson. In reviewing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) It is not the function of the reviewing court to retry the defendant, and we will not reverse the conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of guilt. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

The standard of review articulated above applies whether the evidence is direct or circumstantial. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant. (*People v. Jones* (1985), 105 Ill. 2d 342, 350, 475 N.E.2d 832, 835.) Each link in the chain of circumstances need not satisfy the jury beyond a reasonable doubt; it is sufficient if all the evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt. *Jones*, 105 Ill. 2d at 350, 475 N.E.2d at 835.

The indictment against defendant charged four counts of murder. Count I was based on an intentional and knowing killing of Jasmine Ferguson by beating in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)).

Count II was predicated on the same section, but charged defendant with intentionally and knowingly killing Jasmine by beating and scalding. Counts III and IV were predicated on section 9—1(a)(2) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)). Count III charged defendant with killing Jasmine by beating, knowing such beating created a strong probability of death or great bodily harm to her. Count IV charged the same mental state as count III, except that the acts in question, like count II, were beating and scalding.

Initially, we believe the State proved beyond a reasonable doubt the *corpus delicti* of murder, which consists of the fact of death and its causation by the criminal agency of another. (*People v. Brechon* (1979), 72 Ill. App. 3d 178, 180, 390 N.E.2d 626, 628; *People v. Kinzell* (1969), 106 Ill. App. 2d 349, 355, 245 N.E.2d 319, 322.) While *corpus delicti* does not include proving the person who committed the crime, this is an element the State must prove beyond a reasonable doubt. (*Kinzell*, 106 Ill. App. 2d at 355, 245 N.E.2d at 322.) Direct testimony is not required to establish the *corpus delicti*; it may be inferred from the facts and circumstances properly proven. *People v. York* (1978), 57 Ill. App. 3d 243, 247, 373 N.E.2d 90, 93; *People v. Massey* (1977), 49 Ill. App. 3d 588, 593, 364 N.E.2d 933, 936-37; *Kinzell*, 106 Ill. App. 2d at 355, 245 N.E.2d at 322.

Here, the State's expert testimony established death by criminal agency. Dr. Robert Cutillo testified that his February 26, 1987, examination of Jasmine showed her to be perfectly healthy. Sandra Ferguson testified that when she visited Jasmine and Andrea in mid-April 1987, both children were healthy.

On May 3, 1987, Jasmine became comatose, her heart stopped beating and she no longer could breathe on her own. The treating paramedics and doctors who examined Jasmine at this time described the numerous bruises to her head and severe burn to her buttocks, back and legs. Other injuries located on Jasmine were determined to be consistent with child abuse.

Dr. James Adams, an Ingalls Hospital emergency room physician, Dr. Aaron Zucker, the director of pediatric critical care at Wyler Children's Hospital, a burn specialist at Wyler Children's Hospital, Dr. Yuksai Konakci, a Cook County medical examiner, and Dr. Simpson-O'Reggio, a child abuse specialist at LaRabida Hospital, characterized the injury to Jasmine's buttocks, back and legs to be a full thickness immersion burn involving all layers of the skin. Zucker opined that such an injury occurs when a child is picked up from under the knees and behind the shoulders and dipped into something hot like water. Simpson-O'Reggio denied specifically that the injury was self-inflicted

or resulted from a diaper rash gone awry. Although the State did not elicit testimony that the burn alone would have caused Jasmine's death, Konakci opined that the burn was an attributing cause of death.

Regarding Jasmine's head injuries, Zucker considered it highly unlikely that Jasmine's head injuries were caused by Jasmine falling, as such a fall could not produce the significant head trauma observed given Jasmine's weight and height. The trauma observed was equivalent to the forces found in an automobile accident or falls from a first- or second-story window. Dr. Carol Haller, a neuropathology expert, similarly concluded that Jasmine's head injury was attributable to blunt trauma to the head rather than Jasmine's falling in the home. Haller testified that the head injury rendered Jasmine comatose and produced the brain swelling which in turn caused cessation of Jasmine's heart and lungs. Haller dated Jasmine's brain injury as occurring between May 2 through 5. Dr. Konakci similarly opined that the primary cause of death was blunt trauma to the head.

■ We believe that the jury was entitled to conclude beyond a reasonable doubt that Jasmine's death was caused by the criminal act of some person. No evidence was presented to support an innocent explanation for Jasmine's injuries, such as another child inflicting the injury during play or an intruder causing the injury. (See *People v. Howard* (1979), 74 Ill. App. 3d 870, 393 N.E.2d 1084 (defendant's murder conviction reversed where State's evidence equally supported defendant's defense that intruder murdered defendant's son)).) Further, the jury was entitled to reject defendant's theory that Jasmine's head injuries were somehow attributable to falling and that her burn was nothing more than an advanced case of diaper rash. Defendant lacked expertise on these matters and she was clearly an interested witness. Defendant's theory also conflicted with the numerous expert opinions. Finally, the jury heard the evidence of child abuse to Jasmine and Andrea. The jury was entitled to view Jasmine's death-causing injuries within this context.

The real question this case presents is whether the State proved beyond a reasonable doubt that defendant struck the fatal blow producing Jasmine's death. We believe the State carried its burden.

Dr. Haller's uncontradicted opinion testimony dated the injury as occurring between two to three days before May 5, 1987, the day of Jasmine's death, but no earlier than May 2, 1987. Haller believed that the trauma to the head caused immediate coma.

Regarding who was physically near Jasmine around the time the injury was sustained, we believe the jury could find beyond a reasonable

doubt that Sandra Ferguson, Jasmine's mother, did not inflict Jasmine's fatal head injury. Ferguson testified that she last saw her children on April 11, 1987. She visited the Watt household the same time every month based on her monthly receipt of State aid and food coupons. She travelled by way of public transportation; the trip required three hours.

Defendant's fellow family members testified that Ferguson had not been to the Watt household for some time prior to May 3, 1987, the day Jasmine was rushed to the hospital. Miriam Watt, Jr., Brian Watt and Frederick Watt, Sr., testified that they had not seen Sandra Ferguson for about two weeks prior to May 3. While defendant claimed at trial that Ferguson had visited her on May 1, 1987, to deliver a DCFS form, Detective Robert Farley of the Cook County sheriff's office testified that defendant told him on May 21, 1987, that Ferguson had not been to her house for a long time prior to Jasmine's death and that Ferguson had not hurt the child. Defendant told Farley that "someone on the edge of the circle" had hurt Jasmine.

■ Apart from Ferguson's lack of proximity to Jasmine, the jury had before it the evidence that Ferguson was a good mother. She routinely took Andrea and Jasmine to Dr. Cutillo of the Lawndale Christian Health Center for scheduled visits as well as for minor ailments. His examinations revealed no signs of abuse to Jasmine. Dr. Simpson-O'Reggio's examination of Marie, Ferguson's youngest child, revealed no signs of child abuse. We believe the jury could view this evidence as further proof that Ferguson did not inflict the fatal blow to Jasmine.

The jury could similarly eliminate Ferguson's mother and Rodney Young as the perpetrators. The only evidence to support the claim that these persons somehow abused Jasmine came from defendant's own mouth. The jury could reject this evidence given the expert testimony dating the fatal blow. Any contact these persons had with Jasmine occurred too remotely.

Having eliminated Sandra Ferguson, her mother and Young as the possible perpetrators, the evidence provided the jury only three other adults to choose from: Frederick Watt, Sr., Miriam Watt, Jr., and defendant. Each of these individuals was present when Jasmine was rushed to the hospital. We now focus on why the jury could find beyond a reasonable doubt that it was defendant who fatally injured Jasmine and not her husband or daughter.

From the moment paramedics arrived, defendant began to create evidence against herself through her statements. William Stockwell, a Harvey fire department paramedic, testified that defendant told him at her home that Jasmine suffered from fainting spells and that she had put Jasmine in bed after she suffered such a spell. Defendant unsuccess-

fully tried to arouse Jasmine a few minutes earlier; Jasmine was no longer breathing at this time. Defendant told Stockwell that Jasmine's buttocks were in that condition when Jasmine first arrived and that defendant was trying to get custody of Jasmine because Sandra Ferguson was beating her.

After Jasmine was taken to the hospital, defendant spoke with Roy Wells of the Harvey police department. Defendant told Wells that Jasmine started coughing and would not stop. Defendant picked Jasmine up, but she lost consciousness. Defendant later told Wells at Wyler Children's Hospital that Jasmine had diaper rash when she arrived. A few weeks later, after giving Jasmine a bath, her skin began to come off. Defendant told Wells that Andrea had similar burns on her and that Ferguson was teaching the children that irons are hot.

Defendant next spoke with Drs. Goldenberg and Zucker at Wyler Children's Hospital. Defendant told Goldenberg that Jasmine had a history of being neglected by her natural mother; that Jasmine had a boil on her buttocks which enlarged causing skin to fall off; and that Jasmine was clumsy on occasion, falling down and hitting her head.

Zucker testified that defendant told him that Jasmine was given a bath and told to go upstairs. Defendant then heard a "thud" as Jasmine walked out the door, landing on her stomach. Defendant then put Jasmine to bed. Jasmine later began gasping for air. Defendant later told Zucker that Jasmine came to her in January with "black, crinkly skin" which would come off when Jasmine received a bath. Defendant denied striking Jasmine, and again claimed the child would fall over occasionally, hitting her head.

Defendant next spoke with Detective Robert Farley of the Cook County sheriff's office. Defendant told Farley on May 21 at her home that Ferguson should be investigated, not defendant. Defendant claimed that "someone on the edge of the circle" had hurt Jasmine, but it was not Ferguson. Defendant again claimed that the wound on Jasmine's buttocks was diaper rash.

Later, when defendant was arrested, she told Farley that she heard a "thump" upstairs and found Jasmine lying on the floor. Defendant claimed that Jasmine "never walked any good anyway." Defendant told Farley that Jasmine suffered from an ammonia burn which she first noticed on March 31. Defendant stated that she was the only person who bathed Jasmine and that she gave Jasmine special vaginal baths to take care of Jasmine's wetting her pants. Defendant told Farley that she wore gloves during bath time so that her hands would not get burned.

At trial, defendant viewed photographs of Jasmine's head injuries. She testified that Ferguson told her that Jasmine received one from fall-

ing while walking to defendant's house from the bus, another when she fell at Burger King, and yet a third when she fell a different time. For the first time ever, defendant claimed that Ferguson had visited her home as recently as May 1, 1987. Defendant stuck to her claim that Jasmine's wound on her buttocks was diaper rash, but testified she told Farley that Ferguson told her in April that Jasmine's buttocks were that way when Jasmine returned from Ferguson's .mother's house. Defendant was concerned about the wound, but was informed by Ferguson that it was merely diaper rash needing only Desitin.

We believe defendant's failure to provide a consistent explanation as to what happened to Jasmine during the weeks following Sandra Ferguson's last visit influenced the jury to conclude that defendant inflicted the fatal blow upon Jasmine. The fact that her explanations were also contradicted by the medical evidence and lacked independent corroboration could only further evince her guilt in the eyes of the jury.

We recognize that Miriam, Jr., Frederick Watt, Sr., and defendant all could have struck the fatal blow. However, given defendant's repeated implications of herself, we do not believe it was necessary for the State to eliminate defendant's daughter and husband as the possible perpetrators to obtain a conviction.

Defendant was Jasmine's principal caretaker, was present when the fatal blow was struck, had the opportunity to deliver such a blow, and has yet to reasonably explain what happened to Jasmine despite every opportunity to do so. In the end, what happened to Jasmine on May 3, 1987, behind the closed doors of the Watt household, was a question for the jury to resolve. The jury, not this court, observed the various witnesses testify, including defendant and the other members of the Watt family. On review, we must construe the evidence in the light most favorable to the State, and we cannot second-guess the jury's credibility determinations and the weight it gave to the various witnesses' testimony. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) We only hold that under the applicable standard of review, defendant's conviction must be affirmed.

We next address defendant's contention that she was denied effective assistance of counsel. Defendant predicates her argument on the allegations, which lack record support, that: (1) counsel failed to meet with defendant until the day of trial; (2) counsel failed to interview the State's medical witnesses; and (3) counsel failed to interview the members of the Watt family. Defendant asserts that these failures precluded counsel from effectively trying the case in that counsel was unprepared to cross-examine the experts; was unable to understand the medical reports; pursued unreasonable theories of defense, such as Jasmine's head

injury being caused by a fall and her burn being the result of severe diaper rash; and did not adequately develop defendant's best defense, namely, that anyone could have struck the fatal blow.

Our review of defendant's ineffective assistance of counsel claim is governed by *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and Illinois' adoption of *Strickland* in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. These cases recognize that to succeed on such a claim, a defendant must establish that (1) counsel's performance was seriously deficient, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In evaluating the performance factor, a defendant must also overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and that the challenged conduct might have been nothing more than part of counsel's sound trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) In the end, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

■ We need not address whether defendant's allegations of counsel's various omissions rendered deficient the representation she received, because we elect to reject defendant's *Strickland* claim under the second part of *Strickland*'s two-part test. As *Strickland* indicated, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Here, defendant's conviction turned on whether the jury believed that defendant perpetrated the atrocities which Jasmine suffered. As the State's case proceeded forward, the individuals who could have inflicted Jasmine's fatal wounds decreased. Ultimately, the jury was left with three adult members of the Watt household, including defendant. The State's claim that it was defendant who murdered Jasmine principally turned on defendant's own statements during the investigation, as well as her failure at trial to again provide a reasonable explanation or excuse regarding what happened to Jasmine during those final two weeks of April and the beginning of May. No investigation of counsel

could have prevented the introduction of defendant's past statements. While defendant's argument is stronger that counsel pursued ill-advised theories of defense, counsel had little choice given that these theories were hatched in defendant's own mind and expressed by her to the State's witnesses during the investigation. Accordingly, we believe defendant has failed to show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Defendant finally contends that certain photographs depicting Jasmine were improperly published to the jury on the ground that they were extremely prejudicial and inflammatory. We disagree.

In assessing the admissibility of gruesome photographic evidence, " 'it is the rule that where photographs are relevant to establish any fact in issue that they are admissible in spite of the fact that they may be of a gruesome nature.' " (*People v. Fierer* (1988), 124 Ill. 2d 176, 193, 529 N.E.2d 972, 979, quoting *People v. Foster* (1979), 76 Ill. 2d 365, 377, 392 N.E.2d 6.) " 'The major bulwark against prejudicing the jury is the sound discretion of the trial judge' " (*Fierer*, 124 Ill. 2d at 193, 529 N.E.2d at 979, quoting *People v. Foster* (1979), 76 Ill. 2d 365, 378, 392 N.E.2d 6), and such discretion will not be disturbed on appeal absent a clear showing of abuse. *People v. Lucas* (1989), 132 Ill. 2d 399, 439, 548 N.E.2d 1003, 1019.

In this case, whether Jasmine's back injury resulted from an immersion burn or a very advanced case of diaper rash was a contested issue of fact. Similarly, whether the bruises to Jasmine's head were the result of abuse or from innocent causes was similarly a disputed issue of fact. The trial court, within its discretion, could determine that the photographs in question were relevant on these two issues. Similarly, the court could determine that the photographs aided the jury in understanding the State's expert testimony. Accordingly, while all child abuse cases are gruesome in nature, and while photographs of Jasmine surely elicited strong feelings, we find no abuse of discretion occurred.

For the foregoing reasons, we affirm defendant's conviction and sentence. The judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.